OPINION VIGIL, Chief Justice. {1} The opinion filed on June 12, 2014, is withdrawn, and the following opinion is substituted in its place. {2} This case concerns a father whose parental rights were terminated pursuant to NMSA 1978, Section 32A-4-28 (2005), which provides the mechanism for terminating parental rights under the Abuse and Neglect Act, NMSA 1978, Sections 32A-4-1 to -34 (1993, as amended through 2009). In the proceedings below, the district court concluded that his parental rights should be terminated pursuant to a finding of abandonment under Section 32A-4-28(B)(l), without establishing that the conditions of neglect, by abandonment, could not be cured, as required by Section 32A-4-28(B)(2). The father appeals that ruling, asserting that an ambiguity in Section 32A-4-28 led to an incorrect ruling. He avers that the Children Youth and Families Department (the Department) used its unfettered discretion to pursue a theory of abandonment under Section 32A-4-28(B)(l) without establishing that it made reasonable efforts to cure the causes of neglect, as required by Section 32A-4-28(B)(2). {3} While we do not necessarily agree with the father’s framing of the issue on appeal, we do agree that Section 32A-4-28 is ambiguous with respect to when abandonment may be used as a basis for termination of parental rights. We also agree that this ambiguity led to the improper termination of his parental rights in this case. For the reasons that follow, we reverse the district court’s ruling. I. FACTUAL BACKGROUND {4} Grace H. (Child) was born on September 25, 2006, to Tessa P. (Mother) and Anthony Maurice H. (Father), as a result of an extramarital affair. Father was married and had other children with his wife, while Mother was unmarried and had one other child, Brother. Some time after Child was conceived in Albuquerque, New Mexico, Father moved his family to Texas and Mother followed. Once Child was born, Father saw Child a few times a week for the first three months of her life. In January 2007, Mother left Texas with Child and moved to her parents’ home in Albuquerque. After their departure, Father made some efforts to stay in contact with Mother and Child through phone calls and emails, but he did not visit Child. These communications took place throughout 2007, and Father only communicated once with Mother in 2008. Thereafter, Father was not in contact with Mother or Child from 2008 to February 2011. {5} In June 2008, Mother moved into her boyfriend’s house in Albuquerque. In December 2008, the Department took Child and Brother into custody because the Department received a referral concerning physical abuse of Child and Brother. The children were temporarily placed, with their maternal grandmother in Albuquerque, but she was unsure of maintaining the voluntary placement for financial reasons. {6} The Department began searching for Father in 2009, but it used an incorrect name and failed to locate him. Father returned to Albuquerque in September 2009. By that time, the Department failed to notify Father that termination of his parental rights was in process. In April 2010, Father heard from a friend that Child and Brother were in the Department’s custody. Father promptly’ contacted the Department and identified himself as Child’s father. Father made an appointment to meet with the Department a few days later, on April 19, 2010. Father brought his wife and children to the meeting; a department official described the children as well dressed and well behaved. Father told the Department he had tried to find and contact Mother and Child, but was unsuccessful. Father told the Department that he wanted custody of Child and asked for. visits with her in the meantime. Father admitted that he had not filed the paperwork seeking custody of the Child or paid child support. {7} The next day, a department supervisor told Father over the phone that the Department did not plan to reunite him with Child or allow visitation and planned to go forward with adoption and the termination of his parental rights. The department supervisor advised Father to apply to the court for appointment of counsel, which Father did. Following Father’s meeting, the Department held an internal meeting to discuss the situation. The Department acknowledged that it could have chosen to evaluate Father further and consider him as a placement option, but instead chose to just move forward with the termination hearing. The Department indicated that it was late in the case and the Child needed permanency. II. PROCEDURAL BACKGROUND: PHASES OF THE ABUSE AND NEGLECT PROCEEDINGS {8} The following is an outline and analysis of the procedural history that ultimately resulted in the termination of Father’s rights. It illustrates just how the ambiguity in Section 32A-4-28 came to be exposed in this case. Further, it informs our ultimate holding that Father’s rights were improperly terminated by a finding of abandonment under Section 32A-4-28(B)(l). A. Initial Custody, Adjudication, and Assessment {9} The first phase of an abuse and neglect proceeding involves a determination of the basis for the removal of the child from the parents’ custody and an adjudication of abuse or neglect. See §§ 32A-4-14 to -20. Upon the adjudication of abuse or neglect, the district court orders the family to undergo assessments in order to develop a treatment plan to address the causes and conditions that led to the child’s removal from the home. Section 32A-4-21. {10} In these beginning phases, Father was never given notice of the proceedings, as required by Section 32A-4-18(B), so he did not appear at the initial hearings. The Department did not locate Father to notify him that the Department had taken custody of Child. The Department had mistakenly identified Father as Maurice H., but his name is actually Anthony Maurice H. This misidentification likely led to the Department’s failure to effectuate service upon Father. With the exception of the Department’s failure to serve Father by searching for him under his proper name, there do.not appear to be any unusual circumstances surrounding the initial custody, adjudication, and assessment phase. B. Treatment Phase {11} The second phase is treatment. Once assessments are completed and recommendations are made for treatment, the Department presents the family treatment plan to the district court, which the district court considers and, if appropriate, adopts. See § 3 2 A-4-21(B)(10). The family treatment plan is adopted at the dispositional hearing, which takes place thirty days after the adjudication of abuse and neglect. See § 32A-4-22(A). The treatment plan identifies the required counseling, drug testing, and supervised visitation arrangements that the parents must complete in order to address the causes and conditions which led to removal of the child from the home. The Department is ordered to assist the parents in following through with treatment. Section 32A-4-22(C). During the treatment phase, the Department monitors the parents’ progress in treatment and reports to the district court at review hearings. {12} On May 27, 2009, the district court adopted a family treatment plan for Father. The treatment plan required Father to complete a psychosocial assessment, a substance abuse assessment, sign releases of information, provide names of relatives to the Department, follow all recommendations, and take a paternity test. The family treatment plan had an estimated completion date of August 1, 2009, which was subsequently extended to November 1, 2009, and then to May 1, 2010. C. Permanency Phase {13} The third phase is permanency, which begins within six months of the initial judicial review of the child’s dispositional order adopting the family treatment plan, or within twelve months of a child entering foster care, whichever occurs first. See §-32A-4-25.1(A). Section 32A-4-25.1(B) provides: B. At the permanency hearing, all parties should have the opportunity to present evidence and to cross-examine witnesses. At the conclusion of the permanency hearing, the court shall order one of the following permanency plans for the child: (1) reunification; (2) placement for adoption after the parents’ rights have been relinquished or terminated or after a motion has been filed to terminate parental rights; (3) placement with a person who will be the child’s permanent guardian; (4) placement in the legal custody of the department with the child placed in the home of a fit and willing relative; or (5) placement in the legal custody of the department under a planned permanent living arrangement, provided that there is substantial evidence that none of the above plans is appropriate for the child. {14} The permanency phase is a critical point in the case because the district court must decide whether the permanent placement of the child must be changed from reunification to adoption. See § 32A-4-25.1(B). This determination depends upon the parents’ progress in treatment. The district court considers whether the parents have made sufficient progress in eliminating the causes and conditions which led to the removal of the child from their care. {15} In this case, the district court maintainedFather’streatmentplan and didnot relieve the Department from further efforts to assist Father with treatment. The initial permanency hearing took place in this case on November 17, 2009. The order from that hearing was not entered until March 5, 2010. At the first permanency hearing, the Department requested to change its plan in order to terminate Mother’s parental rights instead of trying to reunite her with the children. The district court ultimately changed the permanency plan to adoption. Father still had not been located and served, and he did not appear at the permanency hearing. The second permanency hearing was held on February 1, 2010. The order from the second hearing was entered on February 15, 2010, before the order from the first permanency hearing. {16} The Department failed in a critical way at this point in the proceedings because the district court kept in place the family treatment plan for Father. The family treatment plan dated January 19, 2010, was part of the permanency hearing report that was incorporated into the permanency order of February 15, 2010. The permanency hearing report contained the family treatment plan for Father previously adopted by the district court, and stated that the reasons for lack of progress toward the desired outcomes were that “Mr. [H.] has not complied with his court ordered treatment. H[is] whereabouts [are] unknown to the Department at this time.” {17} In April 2010, when Father met with the Department, it failed to inform Father that the district court had maintained the family treatment plan for him in its permanency order entered February 15, 2010, which contained an estimated date of completion of May 1, 2010. Despite being under court order to implement Father’s treatment plan, the Department did not provide Father with information regarding his treatment plan, which would have at the very least informed him that the plan existed and allowed him to pursue the required assessments and testing, even if it was on his own. {18} After Father’s initial meeting, the Department held an internal meeting to discuss the situation. Despite the existing permanency order incorporating the family treatment plan for Father, the Department asserted that it could have chosen to evaluate Father and consider him as a placement option, but instead chose to just move forward with the termination hearing. The Department indicated that it was late in the case and Child needed permanency. Accordingly, the department supervisor told Father that the Department did not plan to try to reunite him with Child or to allow him visitation, and planned to go forward with the termination of parental rights hearing scheduled in three weeks. Such disregard for the permanency order requiring the Department to implement Father’s treatment plan eventually led the district court to make decisions about Father based on something other than the facts. {19} In addition to these failures, the Department refused to take additional steps to locate Father. Despite the fact that during the permanency phase, Mother told the Department she was willing to help find Father, it did not elicit her help. Although the Department did request information from Mother about Father’s whereabouts, the Department was aware that Mother was less than keen on locating Father and was therefore less than forthcoming with information that could have helped the Department find him. In fact, Mother knew Father’s correct last name, his email address, and the church he attended, and never provided this information to the Department. Had the Department elicited further information from Mother, it would very likely have had the information it needed to locate Father. D. Termination of Parental Rights Phase {20} The fourth phase of the case is the termination of parental rights. See §§ 32A-4-28 to -29. The Department filed its motion for termination of parental rights on March 18, 2010, and requested a hearing sixty days from the date the motion was filed. {21} The Department sought the termination of Father’s parental rights under Sections 32A-4-28 and 29. The Department did not identify if it sought to terminate Father’s parental rights under Section 32A-4-28(B)(1) for abandonment or Section 32A-4-28(B)(2) for neglect and abuse that is unlikely to change. On April 22, 2010, Father answered the allegations in the motion for termination of parental rights. Father denied the Department’s allegation that he had made no effort to contact the Child and that the Department had made reasonable efforts to locate him. Father alleged that the Department failed to assist with his reunification efforts. Further, he denied the Department’s allegation that the termination of his parental rights would be in Child’s best interest. {22} Even though the Department had actually met with Father in person in April 2010, it filed an amended motion for termination of parental rights onMay4, 2010, which stated: The Department has continued to attempt to locate Mr. [H.], but has been unable to do so. Mr. [H.] has had no contact with the Department or the child during this case, well over six months. Mr. [H.] has not provided any support to the child during the life of this case. Mr. [EL] has never acted as a father to the child during this case. Mr. [H.] has never asked for visitation with the child during the life of this case. It further stated that “[a]s a result of the above stated facts, [the] parental rights of M[aurice] H., with respect to the child should be terminated pursuant to NMSA, 1978 Comp., [S]ections 32A-4-28 and 29, as amended.” The Department made these allegations under oath. By doing so, the Department misrepresented to the district court what it knew about Father and his willingness to parent Child. In our view, the Department ignored its legal responsibility to implement Father’s family treatment plan and further proceeded to subvert Father’s efforts to take responsibility for Child. Such misconduct led the district court to decide the merits of this case based on half-truths rather than on Father’s actual ability to care for Child. {23} The first termination hearing was set for May 18, 2010. A summons of Father was filed on April 26, 2010, and the return of service was filed on May 18, 2010. The termination hearing took four months to complete due to continuances. It was completed on September 29, 2010. The district court entered findings of fact and conclusions of law on November 8, 2010, in which it concluded that it was in Child’s best interests to terminate Father’s parental rights. A post-termination permanency hearing was held on November 24, 2010, and a permanency order was entered on December 6, 2010. {24} Around the time of the first scheduled termination hearing, on May 18, 2010, Child and Brother were still in foster care with their maternal grandmother, and the Department maintained that it was still investigating the potential placement with an aunt in Utah, although it appears Child had no relationship with her. Despite the Department’s insistence that it was still pursuing placement with the aunt, the record reflects that Child was living with foster parents who did not wish to adopt her as of March 18, 2010. Child was not placed with a potentially adoptive, non-relative family until July 2010. As late as the September 29, 2010, termination hearing, the Department acknowledged that Father and his wife could potentially adopt both children if it would conduct a home study of them, but it declined to do so. The Department pursued this position despite the fact that under Section 32A-4-29(F), “[w]hen a motion to terminate parental rights is filed, the [Department shall perform concurrent planning.” A concurrent plan for placement with Father could have been pursued but the record does not reflect that the Department ever made such a plan. {25} Child’s guardian ad litem testified at the termination hearing on September 29, 2010, stating that “it would be in [Child’s] best interests to know her father.” In her view, Father did everything he could to keep in touch with Child without alienating Mother. She also testified that she felt Father should not be considered an unfit parent just because he did not know that paying child support or registering on the putative father registry would help in asserting his parental rights. The guardian ad litem also testified that it seemed like the Department was “trying very hard to terminate [Father’s] rights, and I submit to you that this is not in the best interests of [Child].” Further, the guardian ad litem averred that just because Child was placed in a non-relative home that would like to adopt her at the time of the hearing, she did not believe that was a reason to terminate Father’s parental rights. Accordingly, the guardian ad litem asked the district court to deny the motion to terminate Father’s parental rights, order visits between Father and Child, and give Father the chance to raise Child. {26} Throughout these hearings, evidence was presented that Father was married, volunteered in his church, worked as a grocery store produce manager, and had four children living at home and a fifth who was a successful adult. Father had no criminal record. Father testified that he loved Child and wanted to be there for her every day, and regretted not seeking custody more aggressively, but had not done so because he did not want to take Child away from Mother as long as Mother was caring for her. {27} The district court found that Father had been a good parent to his other five children and was fit to parent Child. It also found that Father had failed to communicate with or provide support for Child for longer than three months and did not provide justifiable cause for such failure. The district court ultimately found that it was in Child’s best interests to terminate Father’s parental rights, and did so pursuant to Section 32A-4-28(B)(1). {28} Father moved to reopen the termination proceedings on March 21, 2011, in order to enter additional evidence in the form of an affidavit of Mother, stating that despite Father’s attempts to contact her, she had refused to disclose any information that would allow him to locate her. The district court granted Father’s motion to reopen the termination proceeding on June 9, 2011. A hearing was held on June 20,2011, to take the testimony of Mother. Amended findings of fact and conclusions of law were entered on August 31,2011. Once again the district court concluded that Father’s parental rights should be terminated pursuant to Section 32A-4-28(B)(1). A final judgment terminating Father’s parental rights was entered on September 13, 2011, incorporating by reference the August 31,2011, findings of fact and conclusions of law. Father appealed that judgment on September 16, 2011. {29} The district court found that any relationship Father had with Child had disintegrated and that Father had abandoned her. A permanency hearing was held on the same day, and both Child and Brother were placed in foster care with a foster mother who is seeking to adopt. {30} In sum, the various instances of the Department’s misconduct include its failure to locate and serve Father, its failure to provide Father with the family treatment plan and allow him to participate as ordered by the district court, its misrepresentation to the district court that Father had still not contacted the Department after he had, and its misleading reports about the status of the Utah placement. The repeated miscarriage of the process deprived the district court of the opportunity to make a decision based on the entire story. Although we do not fault the district court’s decisions based on the information it had, we believe that the district court should be presented an opportunity to reconsider this case with full knowledge of the facts. E. Appeal {31} Father appealed from the order terminating his parental rights. State ex rel Children Youth and Families Department v. Maurice H., No. 31,597, mem. op. ¶ 1 (N.M. Ct. App. Mar. 25, 2013) (non-precedential). Father argued that the district court erred by terminating his parental rights without making a finding that the causes and conditions of his abandonment could not be remedied. Id. Father additionally argued that because he appeared in the district court’s termination proceedings prior to the termination of his rights, the district court was constrained to terminate his parental rights under Section 32A-4-28(B)(2). Maurice H„ No. 31,597, mem. op. ¶ 2. {32} The Court of Appeals affirmed, concluding that the district court properly terminated Father’s parental rights under Section 32A-4-28(B)(l). Maurice H., No. 31,597, mem. op. ¶ 2. The Court of Appeals agreed with the district court that it was unnecessary to make a finding that the Department had made reasonable efforts to reunite the family in order to terminate Father’s parental rights under Section 32A-4-28(B)(1). Maurice H., No. 31,597, mem. op. ¶ 2. We now reverse the Court of Appeals because we agree with Father that his rights should have been adjudicated under Section 32A-4-28(B)(2). III. DISCUSSION {33} The legal question on appeal concerns the meaning and function of Section 32A-4-28, which provides the mechanism for terminating Father’s rights. In light of the numerous missteps illustrated above, our reading of the statute is that Section 32A-4-28(B)(1) is to be used in instances when a parent is completely absent prior to termination. Further, Section 32A-4-28(B)(2) is to be used where a parent is present and willing to participate some meaningful time prior to termination. As articulated below, this reading is supported by both the language and framework of the statute, as well as the policies underlying the Children’s Code and the fundamental nature of parental rights. A. Statutory Scheme {34} This Court reviews issues of statutory interpretation de novo. State v. Almanzar, 2014-NMSC-001, ¶ 15, 316 P.3d 183. T raditional principles of statutory construction apply to our interpretation of Section 32A-4-28. “Our principal goal in interpreting statutes is to give effect to the Legislature’s intent.” Griego v. Oliver, 2014-NMSC-003, ¶ 20, 316 P.3d 865. To glean the Legislature’s intent, the Court “first turnfs] to the plain meaning of the words at issue.” Id. ¶ 21 (internal quotation marks and citation omitted). This Court will only proceed with further statutory analysis “[i]f the relevant statutory language is unclear, ambiguous, or reasonably subject to multiple interpretations.” Almanzar, 2014-NMSC-001, ¶ 15. “However, we exercise caution in applying the plain meaning rule.” State v. Smith, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022. “Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute’s meaning.” Id. (internal quotation marks and citation omitted). Further, the Court rejects “a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute.” Id. ¶ 10. Finally, we analyze a “statute’s function within a comprehensive legislative scheme.” State v. Rivera, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939. “In other words, a statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter.” Id. (internal quotation marks and citation omitted). {35} The termination statute at Section 32A-4-28 provides in pertinent part: B. The court shall terminate parental rights with respect to a child when: (1) there has been an abandonment of the child by his parents; (2) the child has been a neglected or abused child as defined in the Abuse and Neglect Act and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child. The court may find in some casés that efforts by the department or another agency are unnecessary, when: (a) there is a clear showing that the efforts would be futile; or (b) the parent has subjected the child to aggravated circumstances; or (3) the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and the following conditions exist: (a) the child has lived in the home of others for an extended period of time; (b) the parent-child relationship has disintegrated; (c) a psychological parent-child relationship has developed between the substitute family and the child; (d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent; (e) the substitute family desires to adopt the child; and (f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted. {36} The plain language of the statute provides three mechanisms by which to terminate parental rights: abandonment under Subsection (B)(1), abuse and neglect under Subsection (B)(2), and presumptive abandonment under Subsection (B)(3), all of which incorporate some form of abandonment. NMSA 1978, Section 32A-4-2(A)(2)(a) defines abandonment, as referenced in Subsection (B)(1), as “instances when the parent, without justifiable cause . . . left the child with others, including the other parent or an agency, without provision for support and without communication for a period of three months if the child was under six years of age at the commencement of the three-month period.” One definition of a neglected child as contemplated by Subsection (B)(2) is a child “who has been abandoned by the child’s parent, guardian or custodian.” Section 32A-4-2(E)(1). Finally, Section 32A-4-28(B)(3) lists the factors supporting a finding of presumptive abandonment by the parent. See State ex rel. Children, Youth and Families Dep't v. Lance K., 2009-NMCA-054, ¶ 39, 146 N.M. 286, 209 P.3d 778 (“Under Section 32A-4-28(B)(3), a court may terminate parental rights based on presumptive abandonment.”). {37} A plain reading of this statutory language indicates that the Legislature intended abandonment as grounds for termination in three instances. This raises the question: If there are three applications of abandonment as a basis for termination, then what is the difference between them, and when should they be applied? {38} Presumptive abandonment seems clearly distinct from the other two types of abandonment, and it is not applicable here. Child had not been placed with a substitute family with which she formed a psychological parent-child relationship and which desired to adopt her. Accordingly, two provisions remain. Father argues that the statute is ambiguous as to the difference between abandonment and neglect by abandonment, and he argues that the statutory language does not evidence any clear legislative intent as to when either provision should be applied. Based on a plain language reading of the statute, we agree that there is some ambiguity. {39} What can be told from the language of the statute is that Subsection (B)(1), the abandonment provision under which Father’s rights were terminated, does appear to create a bright line rule. As stated in the definition of abandonment, where a parent leaves a child under six years old in the care of another for three months (as was the case here) without provision for her care, and where that parent does not communicate with the child, the parent has abandoned the child. That abandonment alone appears to be grounds for termination without further inquiry. However, this same bright line can apply under Subsection (B)(2) where neglect refers to the very same definition of abandonment. The only difference between the two subsections is that under Subsection (B)(1), the Department is not required to make any attempt to assist a parent in reunification attempts, while Subsection (B)(2) requires the Department to make “reasonable efforts ... to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.” The question still remains: when should either provision be applied? This case is illustrative. {40} The issue before this Court has been framed as a question of when the Department has the authority to move for termination of parental rights on a theory of abandonment under Subsection (B)(1) versus Subsection (B)(2). This is not an accurate framing of the issue. Based on our review of the record, and what has been discussed, it is apparent that the Department did not choose one or the other, but rather the entire process was conducted as an abuse and neglect proceeding under Subsection (B)(2). This is clear from the Department’s adoption of a family treatment plan and its initial attempts to reunite the family, steps which are not included in proceedings under Subsection (B)(1). These steps contemplated Father’s participation. Further, when the Department moved to terminate Father’s rights, it generically stated facts supporting an abandonment finding and asked that the district court terminate pursuant to Section 32A-4-28 without specific reference to Subsection (B)(1). It was the district court that then went on to conclude that Father had abandoned under Subsection (B)(1) as grounds for termination of his parental rights. Which raises the question: If the entire case was proceeding under Subsection (B)(2), and if Subsection (B)(2) gives the district court the same authority to terminate parental rights by abandonment, then why did the district court shift from Subsection (B)(2) and terminate Father’s parental rights under Subsection (B)(1)? {41} The district court had at least some justification for finding abandonment under Subsection (B)(1) because, under a plain language reading of the statute, there was at least one three-month period during which, without justification, Father neither communicated with, nor provided for Child. However, because this case was proceeding under Subsection (B)(2), which provides the same authority to terminate by a finding of abandonment, there is no discernable reason why the district court ordered termination under Subsection (B)(1). Rather, it should have terminated by abandonment under Subsection (B)(2), because the Department and the district court had proceeded under that provision throughout the life of the case. Under this reading, it becomes clear to this Court that the Legislature intended Subsection (B)(1) to be used when there is no parent present with whom the Department could work towards reunification prior to termination. It follows that when a parent is present and willing to participate prior to termination, as Father had indeed done in this case, then the termination of parental rights should proceed on the basis of abuse and neglect under Subsection (B)(2). {42} While we may never fully understand the district court’s reasons for electing to terminate under Subsection (B)(1), we ultimately conclude that it was the Department’s arbitrary actions that created an incomplete picture, ultimately leading the district court to make its decision without being fully informed. Because Father sought to cooperate with the Department in order to retain his parental rights, the Department remained obligated to attempt to make reasonable efforts to assist Father in curing the condition ofneglect, and the district court was constrained to terminate Father’s parental rights only under Subsection (B)(2). Instead, the Department ignored its obligation, and its arbitrary actions led the district court to doubt Father’s presence and willingness to care for Child. The district court based its decision to terminate under Subsection (B)(1) on a lack of information and full disclosure of the actual facts. The Department’s actions ultimately exposed the ambiguity in the statute, which put this case before this Court. {43} As this case illustrates, if we were to rely on the plain meaning rule, as applied to this particular statute, and affirm the district court’s ruling, it is exactly the type of instance where the beguiling simplicity of its application “may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute’s meaning.” Smith, 2004-NMSC-032, ¶ 9. While this statute appears to give the district court the authority to have terminated Father’s rights for the reasons it did, this case illustrates that there is some ambiguity in how to apply the abandonment provisions contained therein. We hold that Subsection (B)(1) is to be used to terminate parental rights by a finding of abandonment where a parent is absent prior to termination, and Subsection (B)(2) is to be used where a parent is present and expresses a legitimate desire to take responsibility for a child prior to termination. This holding is consistent with the policies underlying both the Children’s Code and the fundamental nature of parental rights. B. Policy Considerations {44} There are two policy considerations that support this reading of the statute. These considerations bear directly on whether Subsection (B)(2) must be applied, rather than Subsection (B)(1), in a case such as this where a parent attempts to assert his rights prior to termination. The two policy considerations are the purposes expressed in the Children’s Code and the fundamental nature of parental rights. {45} First, the purpose of the Children’s Code, expressed atNMSA 1978, Section 32A-1-3(A) (2009), is in pertinent part: to provide for the care, protection and wholesome mental and physical development of children coming within the provisions of the Children’s Code and then to preserve the unity of the family whenever possible. A child’s health and safety shall be the paramount concern. Permanent separation of a child from the child’s family, however, would especially be considered when the child or another child of the parent has suffered permanent or severe injury or repeated abuse. It is the intent of the legislature that, to the maximum extent possible, children in New Mexico shall be reared as members of a family unit. This purpose statement is reinforced in the termination section: “[i]n proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated.” Section 32A-4-28(A). {46} Second, the fundamental nature of parental rights has been established by both the United States Supreme Court and this Court. The former has stated that there is a “fundamental liberty interest of natural parents in the care, custody, and management of their child.” Santosky v. Kramer, 455 U.S. 745, 753 (1982). In Santoslcy, the Supreme Court discussed its “historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.” Id. The Supreme Court noted the gravity of this fundamental right, stating: Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. Id. at 753-754. {47} This Court has also recognized the fundamental nature of parental rights. See State ex rel. Children, Youth and Families Dep’t v. Mafin M., 2003-NMSC-015, ¶ 18, 133 N.M. 827, 70 P.3d 1266. The Court acknowledged that the “right to raise one’s child is a fundamental right protected by the Fourteenth Amendment to the United States Constitution.” Id. “It is a right far more precious . . . than property rights."Id. ¶ 20 (internal quotation marks and citation omitted). This Court has also held, however, that the “right is prima facie and not an absolute right.” Roberts v. Staples, 1968-NMSC-109, ¶ 20, 79 N.M. 298, 442 P.2d 788. Therefore, the right “must yield when the best interests and welfare of the child are at issue.” Id. {48} As established by these authorities, the rights of parents are fundamental. However, while the interests of a child may conflict with these fundamental rights, both the statutes and the common law attempt wherever possible to harmonize the interests. Therefore, it seems as though a bright-line application of the abandonment provision in Subsection (B)(1) to the facts of this case is in conflict with the fluidity expressed in the Children’s Code and the case law. Such a strict application not only counters that fluidity, bitt it seems to disregard the fundamental right of Father and does not recognize the severity of the consequences of such a simple, strict application on such a delicate right. See M.L.B. v. S.L.J., 519 U.S. 102, 118 (1996) (“The object of the proceeding is not simply to infringe upon [the parent’s] interest . . . but to end it; thus, a decision against the parent work[s] a unique kind of deprivation .... Few forms of state action ... are both so severe and so irreversible.” (alterations in original) (internal quotation marks and citation omitted)). {49} If the policies underlying the code, as well as the gravity of the fundamental rights of parents are taken into consideration, it becomes clear that a bright-line application of the abandonment provision in this case is contrary to those policies and rights. That then raises the question: Why did the Legislature use such a simple mechanism for terminating such a delicate, fundamental right? Father argues that the purpose of the abandonment provision in Subsection (B)(1) is to terminate based on abandonment where a parent is completely absent prior to termination. This interpretation comports with the entire termination statute because when a parent is completely absent, the Department cannot make any reasonable effort to assist that parent as required by Subsection (B)(2). {50} This case appears to be one in which the Department avoided its obligation to help the parent alleviate the causes for removal of the child from their care when such parent is ready, willing, and able to try to do so. It did so without any justifiable basis. The record indicates that the permanency plan, including the Utah placement, was less than settled prior to termination. Father contacted the Department and attempted to assert his rights approximately one month prior to the initial termination hearing, at a time when a court ordered plan for his treatment existed. The Department articulated no reason it had to believe that Father was unfit. The guardian ad litem actually testified to the contrary — that he appeared fit — and recommended that the Department consider Father. Further, the termination proceeding lasted approximately five months, which raises the question: If the Department knew that the Utah placement was less than certain, then why not at least evaluate Father during that time prior to final judgment on termination? Aside from the statutory requirements and due process concerns, common sense would seem to indicate that the Department should have evaluated Father under these circumstances. {51} Under this particular set of facts, this case seems like exactly the type of case that is unfit for an application of a rigid, bright-line abandonment standard as the basis of termination. To the contrary, it seems like precisely the type of case that would have benefitted from the more flexible and involved approach expressed in Subsection (B)(2). The best interests of Child would still have been paramount, while Father’s fundamental rights would have been respected by at least exploring some reasonable effort to reunify. Such an effort would have satisfied the stated purposes of keeping the family intact whenever possible. Instead, the Department shut down the entire process when Father was actually present, willing, and very likely able to take care of Child. In the words of the Court of Appeals of Kentucky, “[t]o terminate a father’s parental rights on this basis under this provision flies in thte face of the true spirit and intent of this statute, which is to sever relations between innocent children and a deadbeat, disinterested parent.” G.R.M. v. W.M.S., 618 S.W.2d 181, 184. (Ky. Ct. App. 1981). {52} Based on our analysis, it is clear to this Court that Father’s parental rights were improperly terminated under Subsection (B)(1), when he was entitled to assistance and treatment under Subsection (B)(2). This is clear because both subsections refer to the same definition of abandonment as grounds for terminating parental rights, but one requires such assistance, and the other does not. Considering the stated purpose of the Children’s Code and the fundamental nature of parental rights, we hold that where a parent is present and willing to participate prior to termination, termination by abandonment must follow from Subsection (B)(2). Accordingly, we reverse the termination of Father’s parental rights under Subsection (B)(1). IV. REMEDY {53} While we hold that Father’s rights were improperly terminated under Subsection (B)(1), we recognize that under our construction of the termination statute, his rights could be properly terminated under Subsection (B)(2), but only after Father has been assessed and treatment provided to him in an effort to cure the condition of neglect. We also recognize that Child is now part of a foster family that hopes to adopt her, and that creating permanency for Child as soon as possible is of the utmost importance. With these considerations in mind, we remand to the district court to reconsider the termination of Father’s parental rights in light of our interpretation of Subsections (B)(1) and (2) consistent with this opinion, and instruct the district court to conduct assessments of Father and Child. These assessments at the very least should include the evaluations of Father previously ordered by the district court in its family treatment plan, as well as a bonding study of Child in her foster home. {54} After these assessments are completed, the district court should exercise its discretion under the statute to provide a remedy that is consistent with Child’s best interests. We recognize that the district court could very likely face a conundrum if it finds both that the causes of neglect by abandonment can be cured and that Child has bonded with her foster family. If the district court finds that remaining in her foster home with Brother is ultimately in Child’s best interests, Father could choose to relinquish his parental rights given that Child has bonded with her foster family. In that case, an open adoption could be the best outcome given the challenges created by the passage of time. Of course, this particular remedy does not preclude the district court from electing any of the remedies available to it under the Abuse and Neglect Act. What is paramount is that the district court be able to make its ruling on a fully informed presentation of the facts. V. CONCLUSION {55} The Department’s refusal to work with Father undermined his attempt to be a part of his child’s life. The Department’s obstinance towards Father and its position that Father’s “abandonment” of Child justified termination of his parental rights effectively made it easier for a total stranger to acquire parental rights to his child than for Father to maintain his. This is inconsistent with the purposes of the Children’s Code and the fundamental nature of Father’s parental rights. Further, by deliberately presenting misleading or incomplete information to the district court and failing to assess Father’s ability to care for Child, the Department effectively forced the district court to make its ruling on incomplete information. The district court thereby terminated Father’s rights without giving him the opportunity for assessment and treatment that it had previously ordered and that he should have been afforded under Subsection (B)(2). Accordingly, we reverse the termination of Father’s parental rights under Subsection (B)(1) and remand for further proceedings consistent with this opinion. {56} IT IS SO ORDERED. BARBARA J. VIGIL, Chief Justice WE CONCUR: RICHARD C. BOSSON, Justice EDWARD L. CHÁVEZ, Justice CHARLES W. DANIELS, Justice PETRA JIMENEZ MAES, Justice, dissenting