# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: January 12, 2015

**NO. 33,341**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

     Petitioner-Appellee,

v.

**JERRY K.,**

     Respondent-Appellant,

and

**IN THE MATTER OF CLAUDIA K. and MADELINE K.,**

     Children.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Donna J. Mowrer, District Judge**

Children, Youth & Families Department
Charles E. Neelley, Chief Children's Court Attorney
Rebecca J. Liggett, Children's Court Attorney
Santa Fe, NM

for Appellee

Jane B. Yohalem
Santa Fe, NM

for Appellant

Erin Van Soelen
Clovis, NM

Guardian Ad Litem

**OPINION**

**SUTIN, Judge.**

{1}    Jerry K. (Father) appeals the termination of his parental rights as to his two daughters (Children). The Children, Youth and Families Department (the Department) gained legal custody of Children who were held to be "neglected" by virtue of Father's incarceration for crimes unrelated to Children. Father's parental rights were terminated after he was sentenced to thirty-five years in prison.

{2}    Father argues that his fundamental right to parent Children was violated by the Department's refusal to place Children according to his expressed preference of an adoptive home. He also argues that the district court improperly terminated his parental rights after erroneously excluding evidence of his efforts to effectuate his desired placement for Children and of the Department's failure to place Children according to his wishes. In Father's view, had the excluded evidence been admitted, it would have established that Father was able to remedy the causes and conditions of neglect but that the Department did not make reasonable efforts to assist him in doing so. Underlying Father's argument is his desire to have his parental rights restored and to regain legal custody so that he may consent to Children's adoption by a couple that Father considers to be akin to his and Children's family.

{3} We hold the record does not support Father's argument that the district court's order to terminate his parental rights was affected by the allegedly erroneous evidentiary ruling. We conclude that, under the circumstances of this case, the Department's decision to not place Children according to Father's recommendation does not warrant reversal of the district court's judgment terminating his parental rights. We affirm.

**BACKGROUND**

{4} Father had sole custody of Children; Children's mother was, at all times relevant to this appeal, not involved in Children's lives (with the exception of having sent Children one letter), and she is not a party in this appeal. On April 8, 2009, Father was arrested in Clovis, New Mexico, pursuant to a warrant issued by the State of Missouri for having allegedly perpetrated a number of sex crimes against his ex-girlfriend's fourteen-year-old daughter. According to a St. Louis, Missouri police detective with whom Donald Graves, a Department social worker, spoke to on the phone, Father had fled Missouri, thereby evading investigation. Because law enforcement in Clovis who arrested Father learned from Steven Schultze that Children had "no family members in the local area" that could care for Children, they placed Children in the Department's custody.

{5}    At the time of Father's arrest, Father and Children lived in the home of Mr. Schultze, who was working in a temporary job as an Administrator/Director for the Clovis Christian School. Mr. Schultze and his wife, Lois (who did not live in Clovis while her husband was temporarily employed there), had a long-standing relationship with Father, and although they were not biologically related, the Schultzes considered themselves Father's "family," and Father described the Schultzes as his former legal guardians. While Father and Children lived with Mr. Schultze in Clovis, Father's ex-girlfriend contacted Mr. Schultze via e-mail regarding Father's alleged criminal sexual activity perpetrated against her daughter; however, Mr. Schultze did not believe that Father had committed the crimes. Despite a criminal investigation and a temporary suspension from his job in connection with having allowed Father to stay at his house in Clovis while he was a "fugitive," Mr. Schultze was not criminally charged, nor was his employment terminated as a result of having allowed Father to live with him during that time.

{6}    On the day of Father's arrest, Mr. Graves interviewed Father regarding placement options for Children. Father told Mr. Graves that Mr. Schultze, whom Children knew and called "uncle," had a letter written by Father that granted Mr. Schultze guardianship of Children in the event that something happened to Father or he was unable to care for Children; however, this letter was never found, and later,

3

Mr. Schultze claimed to have no knowledge of it. Father also provided Mr. Graves with information about Father's brother and sister-in-law in Colorado with whom Children could stay while Father returned to Missouri to "clear up the situation" of the then-pending criminal charges. Additionally, Father provided the name of another couple, Dean and Dezra Turvaville, as possible caretakers for Children.

{7} After his interview with Father, Mr. Graves contacted Father's brother and sister-in-law who explained that Father's "plan when he was staying with them" was that they would "get . . . [C]hildren as long as [Father] gives . . . permission." Regarding the other possible caretakers for Children, namely Mr. Schultze and the Turvavilles, Mr. Graves stated in his affidavit for an ex parte custody order that the Department could not place Children in their homes without "more information." Mr. Graves also stated in his affidavit that he explained to Father that Children "were placed in custody because there were no family members in the local area and Mr. Schultze is not a [blood] relative[.]"

{8} On November 3, 2009, the district court concluded its adjudicatory hearing. Father pleaded no contest to neglect pursuant to NMSA 1978, Section 32A-4-2(E)(4) (1999, amended 2009), which defines a "neglected child" as one whose parent "is unable to discharge that person's responsibilities to and for the child because of incarceration[.]" At the adjudicatory hearing, the district court adopted the

Department's treatment plan that included, in relevant part, the following information. The Department had located Children's mother and was awaiting the results of an assessment to determine whether she could care for Children. Until that assessment was done, Children would remain with their Department-chosen foster home instead of with Father's brother and sister-in-law, who wished to "gain custody" of Children and who had been approved as "a viable placement option[.]" The Department's treatment plan also noted that Father had been trying to assist the Department in finding permanence for Children while he was incarcerated and that Father "seem[ed] to have a strong concern and care for . . . [C]hildren."

{9}     Children's mother sent one letter to Children, in August 2009, upon the Department's request, but beyond that she failed to respond to the Department's attempt to assess the viability of placing Children with her; ultimately the Department was unable to locate her, and her rights were later terminated. In December 2009, Children were placed with Father's brother and sister-in-law in Colorado. In September 2010, Father was sentenced to thirty-five years in a Missouri prison. After Father was sentenced, Father's brother and sister-in-law advised the Department that they did not intend to serve as a permanent placement option for Children and that they would only keep Children until the Department was able to find a new placement.

{10} In October 2010, the district court held a permanency review hearing. Among other things, the Department permanency worker testified that the Department was looking into long-term placement options and that once such a placement had been found, Children would be brought back from Colorado to New Mexico. The Department also requested that Children's permanency plan be changed from reunification with Father to termination of Father's parental rights and adoption because Father would not be available to parent Children through their adolescence.

{11} Father, who testified via telephone at the October 2010 hearing, stated that he was not aware until the hearing that Children would be removed from his brother and sister-in-law's home. Having learned that Children would be moved, Father testified that he would like the Department to consider placing Children with Steve and Lois Schultze. At the time of the October 2010 hearing, the Schultzes lived in California.

{12} Following the October 2010 hearing, the district court entered an order changing Children's permanency from reunification to adoption and reflecting, among other things, that Father had complied with his treatment plan by writing letters to Children and by advising the Department of his brother in Colorado as a placement for Children. On the same day that the court's permanency review order was entered, the Department filed a motion for termination of parental rights.

6

{13}   In its motion to terminate Father's parental rights, the Department stated that efforts to reunify Father with Children would be futile owing to the length of Father's incarceration.  The Department also stated that Father's brother and sister-in-law did not want to adopt Children and recommended "the Department" as the sole agency or person that "should be considered by the court to take custody" of Children.  In November 2010, the Department moved Children into a non-relative, foster care placement with a family that wished to adopt Children.

{14}   On March 8, 2011, the district court, Judge Orlik, held a hearing on the Department's motion to terminate Father's parental rights.  In his opening statement, Father's counsel represented that Father would be willing to "relinquish his parental rights" to Children provided that Children would be placed with the Schultzes.  Father's counsel further argued that since Children's return from Colorado, the Department had ruled the Schultzes out as a potential placement for Children without having investigated the viability of placing Children with them.

{15}   The district court admonished the Department for having placed Children with potentially adoptive foster parents without having first investigated placing Children with the Schultzes, with whom Children had some relationship and who may be

7

considered Children's "fictive kin[1]." Rather than proceed with the March 8, 2011, termination of parental rights hearing, the district court reset the matter for forty-five days hence[2]. The court ordered that during the forty-five-day delay, the Department would "facilitate and conduct an expedited investigation and background check of" the Schultzes, and concurrent with that investigation, conduct an "ICPC"[3] investigation into the viability of placing Children with the Schultzes.

{16} The Department requested an ICPC home study regarding the Schultzes from California, and while it awaited the results, it conducted its own investigation into the propriety of placing Children with the Schultzes. Based on information gathered from the Clovis Police Department and the Curry County Sheriff's Office about Mr. Schultze, the Department submitted a written report to the district court in May 2011 stating, among other things, that it had "grave concerns that Mr. Schultze was allowing [Father] to reside in his home" despite having been contacted by the mother

---

[1] According to Department-issued regulations, the term "fictive kin" refers to "a person not related by birth or marriage who has an emotionally significant relationship with the child." 8.26.4.7(P) NMAC (8/15/2011).

[2] As a result of various factors, the termination hearing was not held forty-five days later; rather, it was ultimately conducted in March and June 2013.

[3] "ICPC is an acronym for "Interstate Compact on the Placement of Children." 8.26.5.15(A)(8) NMAC (8/15/2011). The ICPC allows states to cooperate with each other in the interstate placement of children by, among other things, allowing authorities in the state of a prospective out-of-state placement to "ascertain the circumstances of the proposed placement[.]" NMSA 1978, § 32A-11-1(B) (1993).

of the victim of Father's alleged crimes who had detailed "the sex acts that [Father] forced the teenage victim to endure[,]" and "Mr. Schultze [ignored] the e-mails from the victim's mother and failed to confront [Father] about their authenticity." In September 2011, California's Monterey County Department of Social and Employment Services provided the Department with a home study approving placement of Children with the Schultzes who, among other things, had indicated their willingness to care for Children and had completed foster parent training in anticipation of Children's placement with them. The report, having evaluated many factors, was highly favorable to and recommended placement with the Schultzes. Citing confidentiality issues, the Department refused to disclose the results of the Schultzes' ICPC home study to Father, forcing Father to file a motion to compel discovery.

{17}     On April 3, 2012, the district court, Judge Mowrer, held a permanency hearing.[4]  Among other things, a Department permanency worker testified that the Department had determined that the Schultzes were not Children's "fictive kin." Also during the hearing, the district court ordered the Department to disclose the results of the Schultzes' ICPC home study to Father and to the district court. By the

---

[4] Judge Orlik, who had previously presided over the case, passed away in May 2011.

time of the April 3, 2012, hearing, Children had been with their foster parents, who were willing to adopt them, for nearly two years, and according to the Department, had an "extremely strong psychological bond" with them; nevertheless, the court stated that it had not "ruled out" Children's placement with the Schultzes.

{18}   In accord with the district court's order to do so, the Department provided a copy of the Schultzes' ICPC home study results to Father, and Father provided a copy to the district court.   Approximately seven months had passed between the Department's receipt of the ICPC home study and Father's receipt of a copy.   Based on the results of the ICPC home study, Father filed a motion requesting the district court place Children with the Schultzes; however, the district court denied the motion on the ground that it "did not have authority to order a specific placement with Mr. [and] Mrs. Schultze."

{19}   In June 2012, the Department filed a "First Amended and Superseding Motion for Termination of Parental Rights."   In anticipation of a hearing on its motion to terminate Father's parental rights, the Department had already filed a motion in limine to exclude "placement issues" from the hearing on the ground that placement issues, meaning particularly, the Department's decision to not place Children with the Schultzes, were irrelevant and inadmissible on the issue of whether Father's parental

rights should be terminated. Father responded to the Department's motion in limine by requesting that the court deny it.

{20} In July 2012, following a hearing on the Department's motion in limine, the district court ordered the exclusion of "issues concerning [the Department's] placement decisions[,]" which was defined by the court as evidence pertaining to the Department's determination of "where and with whom [C]hildren . . . are to live[,]" from the termination of parental rights hearing. As a caveat to its order excluding evidence of placement issues, however, the district court ordered that Father could "provide evidence that he has given placement alternatives and information to the Department." The district court's ruling in that regard was intended to allow Father to respond, during the termination hearing, to the Department's allegation in its motion to terminate Father's parental rights that "[Father had] not shown himself to be able to designate a suitable and appropriate caregiver for . . . [C]hildren."

{21} On March 7, 2013, and June 18, 2013, the district court held a trial on the issue of terminating Father's parental rights. Following the hearing, the district court concluded, in relevant part, that clear and convincing evidence established that Children were neglected because Father was unable to discharge his responsibilities to and for Children owing to his incarceration, that the conditions and causes of the neglect were unlikely to change in the foreseeable future despite the Department's

11

reasonable efforts to facilitate a treatment plan, and that it was in Children's best interest to be adopted and not reunified with Father. Accordingly, the district court terminated Father's parental rights to Children. Further details of the district court's ruling will be discussed as needed in the body of this Opinion.

{22} In his appeal from the district court's termination of parental rights order, Father primarily argues that the district court erred in excluding evidence of Father's efforts to arrange for Children to be adopted by the Schultzes. In Father's view, his efforts regarding the Schultzes demonstrated that he was acting to remedy his inability to parent Children despite his incarceration. Relatedly, Father argues that the district court erred in excluding evidence of the Department's failures regarding the Schultzes as a potential placement for Children because that evidence was relevant to the question whether the Department made reasonable efforts to assist Father in remedying the causes and conditions of neglect. Father asserts that the district court's erroneous exclusion of relevant evidence led the court to terminate his parental rights without a valid statutory basis.

{23} We conclude that there is no legal basis for reversing the district court's judgment terminating Father's parental rights. Accordingly, we affirm.

12

**DISCUSSION**

{24}     Pursuant to NMSA 1978, Section 32A-4-28(B)(2) (2005), the court shall terminate parental rights with respect to a neglected child when the court finds by clear and convincing evidence that "the conditions and causes of the neglect . . . are unlikely to change in the foreseeable future despite reasonable efforts by the [D]epartment . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." *See State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 ("The standard of proof for termination of parental rights is clear and convincing evidence."). On appeal, this Court does not re-weigh the evidence, rather, we view the evidence in the light most favorable to the prevailing party. *State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 19, 141 N.M. 299, 154 P.3d 674. We review the admission or exclusion of evidence under the abuse of discretion standard. *See In re Esperanza M.*, 1998-NMCA-039, ¶ 7, 124 N.M. 735, 955 P.2d 204.

{25}     Father concedes that Children were neglected pursuant to Section 32A-4-2(E)(4) in that he was "unable to discharge [his] responsibilities to and for [Children]

because of incarceration[.]"[5]  Father argues, however, that by helping to arrange for Children's placement with his brother and sister-in-law, by identifying the Schultzes as a potential foster placement, and by offering to consent to the Schultzes' adoption of Children, he effectively "remedied his inability to parent Children because of his incarceration[.]"  He argues further that by excluding evidence of his efforts to arrange Children's adoption by the Schultzes and of the Department's failure to comply with his desire to effect Children's adoption by the Schultzes, the district court excluded evidence that was directly relevant on the issue of termination, namely, whether the conditions and causes of Father's neglect were likely to change despite reasonable efforts by the Department.  *See* § 32A-4-28(B)(2) (requiring the district court to terminate parental rights if, despite reasonable efforts by the Department, "the conditions and causes of the neglect . . . are unlikely to change in the foreseeable future").

---

[5]  To the extent that Father argues that his right to due process was violated by the district court's finding that Children were neglected on grounds other than his incarceration, Father has failed to demonstrate that in the absence of the alleged error, it is reasonably probable that the outcome of this case would have been different. *See In re Pamela A.G.*, 2006-NMSC-019, ¶ 14, 139 N.M. 459, 134 P.3d 746 (stating the standard required to procure reversal pursuant to a claimed deprivation of due process).  In light of his concession that Children were neglected pursuant to Section 32A-4-2(E)(4), and he was otherwise unable to discharge his parental duties in light of his extended incarceration, we do not consider the issue whether Children were otherwise neglected.

{26} Father's argument is contradicted by the record and it is, therefore, unpersuasive. Father's argument is founded on a misconstruction of the district court's evidentiary order. The district court's order on the Department's motion in limine to exclude placement issues from the termination of parental rights hearing was specific and limited in its exclusion of "any evidence or argument concerning placement of . . . [C]hildren ('placement' meaning a determination of where and with whom [C]hildren in [the Department's] custody are to live)[.]" The order was intended to prevent Father from raising the Department's decision to not place Children with the Schultzes as an issue in the termination of parental rights hearing. The order expressly permitted Father to provide evidence that he had "given placement alternatives and information to the Department." And, contrary to Father's argument, the district court's order did not preclude Father or the Department from presenting evidence of the time-line of the Department's activities that, if presented, would illustrate any delays in the Department's actions that bore on the question whether the Department made reasonable efforts to assist Father.

{27} Further, testimony from the termination of parental rights hearing and the district court's findings of fact and conclusions of law demonstrate that the court permitted and considered evidence of Father's efforts to have Children placed with and adopted by the Schultzes. We particularly note that Father testified, in response

to a question by the Department's counsel, that "the moment" he learned that Children could not stay with his brother and sister-in-law, he stated his desire for Children to "go to" the Schultzes. Further, in its findings of fact and conclusions of law, the district court recognized Father's effort regarding the Schultzes when it observed that Father "directed [the Department] toward persons he felt were fictive kin, Mr. [and] Mrs. Schultze[,]" and he "attempted to have the [c]ourt force [the Department] to place [Children] with Mr. [and] Mrs. Schultze."

{28} Additionally, in regard to evidence of the Department's "delays" in investigating the Schultzes, we observe that the district court found: (1) that the Department learned, in August 2010, that Father's brother and sister-in-law would not permanently provide placement for Children; and (2) that not until after Judge Orlik's March 28, 2011, order to do so did the Department complete an ICPC home study on Mr. and Mrs. Schultze, after which the Department ultimately determined that it would not place Children with the Schultzes. Additionally, we observe that during the termination hearing, a representative of the Department testified that in an October 19, 2010, letter she advised Father that the Department would look for placement alternatives and asked him to provide input regarding potential placement, but that by the October 26, 2010, permanency hearing, Father had yet to receive that letter.

{29} To the extent that Father wished to present additional evidence of his efforts to remedy the conditions and causes of neglect or of the Department's failure to make reasonable efforts to assist him in doing so, Father does not state, with specificity, what that evidence was, and we will not attempt to guess what it may have been. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (stating that an appellate court will not attempt to "guess at what a party's arguments might be" (alteration, internal quotation marks, and citation omitted)), *cert. denied*, __ U.S. __, 134 S. Ct. 1787 (2014). Based on the record before us, we conclude that the district court had before it the evidence that Father complains was excluded and that the court's judgment reflects that the court considered the at-issue evidence in making its determination. Therefore, Father has not demonstrated that the district court's evidentiary ruling constituted an abuse of discretion. *See Esperanza M.*, 1998-NMCA-039, ¶ 7 (stating that we review evidentiary issues under an abuse of discretion standard).

{30} The subtext of Father's argument regarding the Department's efforts and the apparent crux of his appeal is Father's view that his fundamental right to parent Children entitled Father to decide that Children should be placed with, and ultimately adopted by, the Schultzes and that the district court erred by terminating his parental rights notwithstanding his efforts to effect Children's placement with or his offer to

relinquish his parental rights to the Schultzes. Well-intentioned though he may be, Father's desire to dictate the Department's placement of Children at this point in the proceedings is not supported by the law.

{31} When Father pleaded no contest to the allegation that Children were neglected as a result of Father's inability "to discharge [his] responsibilities to and for [them] because of incarceration[,]" the district court ordered Children into the legal custody of the Department. Absent an abuse of its discretion, the Department's "legal custody" of Children permitted it, alone, to determine where and with whom Children would be placed. *See* NMSA 1978, § 32A-1-4(O) (2005, amended 2009) (stating that " 'legal custody' means a legal status created by order of the court . . . that vests in a . . . department . . . the right to determine where and with whom a child shall live"); *State ex rel. Children, Youth & Families Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 11, 143 N.M. 335, 176 P.3d 324 (stating that the Department "has the discretion to place children within the foster system, and the district court [may] only overrule a [Department] decision if the court determines that [the Department] has . . . abused its discretion in the placement or proposed placement of the child" (omission in original) (alteration, internal quotation marks, and citation omitted)). Accordingly, while Father could and did express his preferences in regard to Children's placement,

once Children were legal custodians of the Department, Father was not in a position to decide where or with whom Children would be placed.

{32} As we understand Father's argument, Father wishes to have his parental rights restored so that he may relinquish his parental rights to Children in favor of the Schultzes, who are willing to adopt them. In Father's view, this arrangement would serve the best interests of Children and also serve Father's interest to the extent that, were Children adopted by the Schultzes, Father could maintain a relationship with Children, which the Schultzes are willing to facilitate. While Father's arguments may be theoretically compelling, as a matter of practicality, they are unacceptable.

{33} Father has failed to provide any authority for the proposition that, under the circumstances of this case, he could lawfully relinquish his rights to Children on the condition of their adoption by the Schultzes. We assume no such authority exists. *See State ex rel. Children, Youth & Families Dep't v. Arthur C.*, 2011-NMCA-022, ¶ 46, 149 N.M. 472, 251 P.3d 729 ("We assume where arguments in briefs are unsupported by cited authority, counsel after a diligent search, was unable to find any supporting authority." (internal quotation marks and citation omitted)). Nor has Father cited any authority for the proposition that were we to reverse the district court's judgment terminating his parental rights, Father could successfully direct the Department to place Children with the Schultzes. *See id.*; *State ex rel. Children,*

19

*Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 27, 132 N.M. 299, 47 P.3d 859 (recognizing that the Department is not required to make "efforts subject to conditions unilaterally imposed by the parent").

{34} The district court concluded that Children's best interests would be served by being adopted. Father refused to relinquish his parental rights to allow Children's present foster parents to adopt them, and the Department concluded that it would not place Children with the Schultzes as a potential adoptive home. Because Children cannot be adopted unless Father relinquishes his parental rights or consents to their adoption or, alternatively, unless Father's parental rights are terminated, reversing the district court's judgment would subject Children to a sustained period of legal limbo in which they would remain legal custodians of the Department, ineligible for adoption, yet, owing to Father's lengthy incarceration, would also be ineligible for reunification. *See* NMSA 1978, § 32A-5-17(A)(5) (2005); NMSA 1978, § 32A-5-19(A) (2001) (stating that consent to adoption or relinquishment of parental rights is a prerequisite to a child's adoption except in a circumstance in which the parent's parental rights to the child have been terminated). Thus, even were we persuaded that the Department's failure to comply with Father's attempt to dictate Children's foster placement with and adoption by the Schultzes was grounds for reversal, reversing the district court's judgment in this case would effectively place Father's impracticable

20

desire to dictate Children's placement over Children's best interests. This we will not do. *See State ex rel. Children, Youth & Families Dep't v. Maurice H.*, 2014-NMSC-034, ¶ 47, 335 P.3d 746 (recognizing that, although parental rights are fundamental, they yield to the best interests and welfare of the children at issue); *State ex rel. Children, Youth & Families Dep't v. William M.*, 2007-NMCA-055, ¶ 66, 141 N.M. 765, 161 P.3d 262 ("When balancing the interests of parents and children, the court is not required to place the children indefinitely in a legal holding pattern, when doing so would be detrimental to the children's interests." (internal quotation marks and citation omitted)).

**CONCLUSION**

{35}     We affirm the district court's judgment terminating Father's parental rights to Children.

{36}     **IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**


_____
**LINDA M. VANZI, Judge**


_____
**M. MONICA ZAMORA, Judge**

21