Martin J.
A motion that the Court might pro. ceed in this case, has been resisted on two grounds ;
1. That, the city and its environs were by p-eneral’ orders of the officer, commanding: the ° ⅜ ° district, put on the 15th of December ' 7 • ' i r • 7 r last, under strict Martial JUqiv.
2d. That by the 3d sec. of an act of assembly, approved on the 18th of December last, all proceedings in any civil case are suspended.
I. At the close of the argument, on Monday last, we thought it our duty, lest the smallest delay should countenance the idea, that this Court entertain any doubt on the first ground, instantly *531 to declare viva voce (although the practice is to deliver our opinions in writing) that the exercise of an authority, vested by law in this Court, could . * not be suspended by any man.
In any other state but this, in the population of which are many individuals, who not being perfectly acquainted with their rights, may easily be imposed on, it could not be expected, that the Judges of this Court should, in complying with the constitutional injunction in all cases Jo adduce the reasons on which their judgment is founded,, take up much time to shew that this Court is bound utterly to disregard what is thus called Martial Law ; if any tiling be meant thereby, but the strict enforcing of the rules and articles for the government of the army of the United States, established by Congress or any act of that body relating to military matters, on all individuals belonging to the army or militia in the service of the United States. Yet, we are told that by this proclamation of Martial Law, the officer who issued it has conferred on himself, over all his fellow-citizens, within the space which he has described, a supreme and unlimited power, which being incompatible with the exercise of the functions of civil magistrates, necessarily suspends them.
This bold and novel assertion is said to be supported by the 9th section of the first article ef the Constitution of the United States, in which *532 detailed the limitations of the power of the Legislature of the Union. It is there provided that the privilege of the writ of Habeas Corpus' shall not be suspended, unless, when in cases of invasion or rebellion, the public safety may require it. We are told that the commander of the military district is the person who is to suspend the writ, and is. to do so, whene'ver in his judgment the public safety appears to require it: that, as he may thus paralyse the arm of the justice of his country in the most important case, the protection of the personal liberty of the citizen, it follows that, as he who can do the more can do the less, he can also suspend all other functions of the civil magistrate, which he does by his proclamation of Martial Law.
This mode of reasoning varies toto celo from the decision of the Supreme Court of the United States, in the ,case of Sxvartout and Bollman, arrested in this city in 1806. by general Wilkinson. The Court there declared, that the. Constitution had exclusively vested in Congress the right of suspending the privilege of the writ of Habeas Corpus, and that body was the sole judge of-the Necessity that called for the suspension. “If, at any time,” said the Chief Justice, “the public safety shall require the suspension of the powers vested in the Courts of the United States by this act, (the jHabeas Corpus act,J it is for the Legislature to say so. This question depends on politi *533 cal considerations, on which the Legislature is to decide. Till the Legislature will be expressed, this Court can only see its duties, and must obey the law.” 4 Crunch 101.
. The high authority of this decision seems however to be disregarded ; anda contrary opinion is said to have been lately acted upon, to the distress and terror of the good people of this state : it is therefore meet to, dispel the clouds which designing men endeavor to cast on this article of the Constitution, that the people should know that their rights, thus defined, are neither doubtful or insecure, but supported on the clearest principles of our buys.
Approaching, therefore, the question, as if I were without the above conclusive authority, I find it provided by the Constitution of this state that “no power of suspending the laws of this, state shall,bte exercised, unless by the Legislature, or under its, authority.’'* The proclamation of Martial LaW, therefore, if intended to suspend the functions of this Court or its members, is, an attempt to exercise powers thus exclusively vested in the Legislature.- Í therefore cannot hesitate in saying that it is in this respect null and void. If, however, there be aught in the Constitution or laws of the United States that really authorises the commanding officer of a military district tft .suspend the laws of this state, as that Constitution *534 and these laws are paramount to those of the state, must regulate the decision of this Court.
Th is leads me to the examination of the power of suspending the writ of Habeas Corpas, and that which it is said to include, of proclaiming Martial Law, as noticed in the Constitution of the United States. As in the whole article cited, no mention is made of the power of any other branch of government but the Legislative, it cannot be said that-any of the limitations which it contains extend to any of the other branches. Imquum est perimi cíe pacto id dc quo cogitation non est. If,'therefore, this suspending power fxist in the executive (under whose authority it has been endeavoured to exercise it) it exists without any limitation, then the president possesses without a limitation ¡a power which the Legislature cannot exercise without a limitation. Thus he possesses ⅛ greater power alone than the house of representatives, the senate and himself jointly.
Again, the ppwer of repealing a law and that of suspending it (which is a partial repeal) are Legislative powers. For eodem mfido^ quo quid constituitur, eodem modo destruitur. As every Legislative power, that may be exercised under the Constitution of the United States, is exclusively .vested in Congress, all others are retained by ⅞⅛ people of the several states.
In England, at the time of the invasion of the pretender ⅜ assisted by the forces of hostile nations,. *535 the Habeas Corpus act was indeed suspended, but the executive did not thus of itself stretch its Own authority, the precaution was deliberated upon and taken by the representatives of the people. Delolme 409. And there the power is safely lodged without the danger of its being ■abused. Parliament may repeal the law on which the safety of the people depends ; but it is not their own caprices and arbitrary humours, but the caprices and arbitrary humours of other men ■which they will have gratified, when they shall have thus overthrown the columns of public liberty. Id. 215.
If it be said that the laws of war, being the laws of the United States, authorise the proclamation of Martial Law, I answer that in peace or in war no law can be enacted but by the Legislative power, in England, from whence the American jurist derives his principles in this respect," “Martial Law cannot be used without the authority of parliament,” 5 Comyns 229. The. authority of the monarch himself is insufficient. In the case of Grant vs. Sir C. Gould, H. Hen. Bl. 69, which was on a prohibition (applied for in the Court of Common Pleas) to the defendant as judge advocate of a Court Martial to prevent the execution of the sentence of that military tribunal, the counsel, who resisted the motion, said it was mot to be disputed that Martial Law can only be exercised in England, so far as it is authorised by *536 mutiny act and the articles of war, all which ai'e established by parliament, or its authority, and the Court declared it totally inaccurate to state .any other Martial La\^> as having any plate What. ever within the realm of England* In that country, and in these states, by Martial Law is understood the j urisprudence of these cases, which are decided by military judges or Courts Martial* When Martial Law is established* and prevails in any country, said lord Loughborough, in the case cited, it is totally, of a different nature from that which is inaccurately called Martial Law (because the decisions are by a Court Martial) but which bears no affinity to that which was formerly attempted to be exercised in this kingdom* which was contrary to the Constitution and Which has been for a century totally exploded. When Martial Law prevails, continues the judge, the authority under which it is exercised claims juris*. diction over all military persons in all circumstances : even their debts are subject to inquiry by military authority, every species of offence committed by any person who appertains to the army is tried, not by a civil judicature, but by the judicature of the corps or regiment to which he belongs.
This is Martial Law as defined by Hale and Blackstone, and which the Court declared not to exist in England. Yet, it is confined to military persons. Herelt is contended, and the Court must *537 admit, if we sustain the objection, that it extends to all persons, that it dissolves for a while the government of the state.
. . Yet, according to our laws, all military courts are under a constant subordination to the ordinary courts of law. Officers, who have abused their powers though only in regard to their own soldiers, are liable to prosecution in a Court of law, and compelled to make satisfaction. Even any flagrant abuse of authority by members of a Court Martial, when sitting to judge their own people, and determine in cases entirely of a military kind, makes them liable to the animadversion of the Civil Judge. Delobne, 447, Jacob's Law Dict. Verbo Court Martial. Iiow preposterous then the idea that a military commander may, by his own authority, destroy the tribunal established by law as the asylum of those oppressed by military despotism !
II. It is further contended that the 3d section of the act of assembly, approved on the 18th December last, suspends all proceedings in civil cases, until the 1st. of May next: but it is answered that this section is unconstitutional and void, in as much as it violates the Constitution of the United States, which provides that no state shall pass any law impairing the obligations of contracts, this laws delaying for upwards of four months the recovery of sums due on. contracts,
*538 ^ ^ no longer a question in the United States, . : . whether unconstitutional acts of the Legislature be of any force and effect. This state is among those, the Constitution of which contains an express provision on this subject : “All laws contrary to this Constitution shall be null and void and this Court, in the case of the syndics of Brooks vs. Weyman, ante 12, determined it was their province to enquire into and pronounce upon the constitutionality of any law invoked before them. If therefore the section under consideration really impairs the obligations of contracts, we must declare it null and void.
The obligation of contracts consists in the necessity under which a man finds himself to do, or refrain from doing some thing. This obligation exists generally both in foro legis and in foro conscientiæ tho’ it does at times exist in one of these only. It is certainly of the first, that in foro legis, which, the framers of the Constitution spoke, when they prohibited the passage of any law impairing the obligations of contracts. Now, a law absolutely recalling the power which the creditor enjoys of compelling his debtor ¿n foro legis to perform the obligation of his contract, would be a law destroying the obligation of the contract in foro legis. Since a right, without a legal remedy, ceases to be a legal right? It would impair the obligation of the contract-by destroying its legal obligation ; in other words by reducing an *539 obligation both in foro legis and in foro conscien-tice to an obligation in foro conscientice only : a legal and moral right to a moral right only, The remedy in foro legis, constituting the legal right of the creditor, constitutes also its correlative, the legal duty or obligation of the debtor ; and a law which reduces a legal to a moral obligation is one; which in foro legis destroys the obligation. It appears therefore to me incorrect to say that the Legislature may effectually do, as to the remedí/ or effect of the obligation, that which it cannot d.o as to-the right; and I conclude that a law destroying or impairing the remedy is as unconstitutional as one affecting the right in the same manner; for in foro legis the effects of both laws must be the same.
Likewise a law procrastinating the remedy, generally speaking, destroys part of the right. He pays less who pays later. Minus solvit qui serius solvit. Neither is the procrastination properly compensated by the allowance of interest in the mean while. To many men, in many circumstances, there is a wide difference between one hundred dollars payable to-day and one hundred and six dollars payable in a twelvemonth, whatever may be the certainty that no disappointment will occur; and in many cases the delay is likely to be productive of considerable clanger to the solvability of the debtor. Any indulgence therefore in point of .time, afforded by the *540 Legislature to the debtor, is a correlative injury to the creditor in the same degree, tho’ of a different nature, as a correspondent indulgence by a proportionate reduction of the debt.
Til at such were the impressions of the framers of the Constitution will appear, if in expounding that instrument, we follow the rules laid down for the exposition of statutes : if we consider the old law, the mischief and the remedy.
The charter of our Federal rights was framed not many years after the termination of the war which secured our independence. The disasters, attending the arduous conflict, had disabled many and honest individual from punctually discharging his obligations ; and the Legislature of some of the states, more attentive to afford immediate and temporary relief, than a more remote and lasting one, by a sacred regard for good faith, and the: consequent preservation of credit, passed laws, meliorating the condition of debtors to the injury and ruin of creditors. In one state, an emission of paper money, for the redemption of which, no day was fixed, nor any fund provided, was made a legal tender. In other words, an obligation to pay gold and silver, was impaired by being reduced to an obligation to pay irredeemable paper ; else where a similar obligation was impaired by being reduced to an obligation to deliver a tract of pine barren land, or an instalment law was passed and an obligation to pay to day was impaired by *541 being reduced to an obligation to pay at several periods, at the distance of intervening wars. Such was the old law. The consequent diminution of the fortunes of several individuals, the total ruin of others, and the indispensable concomitant the destruction of credit produced a stagnation of business, which considerably affected public and private prosperity, such was th. mischief.
The Feeders! compact provided that the Legislature of no state should retain the power of m ik-ing any thing but gold and silver a tender in ' he discharge of debts, in order to avert in future the mischiefs resulting from laws impairing the obligation of a contract to pay gold and silver, by reducing it to an obligation to pay paper, pine barren ¿and, or indeed, any thing but gold and silver. Yet the remedy was not commensurate with the evil ; the healing process was therefore continued, in order to prevent the passage of laws impairing the obligation of a contract to pay to day by reducing it to an obligation to. pay on a distant day or days, or indeed any attempt at a legislative interference between parties to a contract, by favouring either party to the injury of the other ; and it was provided that no state should pass any law impairing the obligations of contracts. If the restriction from making any thing but gold and silver a tender in the payment of debts, had not preceded that from passing any law impairing the obligation of contracts, there might be some, *542 th0USrh very little, ground to say that the latter clause vv >aid have been satisfied by restraining the passage of laws authorising the payment of one thing instead of another.
I therefore- find no difficulty in concluding that an act of a state Legislature, the obvious object of which is to relieve debtors by postponing the recovery, and consequently the payment of debts, impairs the obligation of contracts, and as such is unconstitutional, and the Court is bound to disregard it, wh atever may be the hard necessity which, in the opinion of those who exercise the legislative powers of the state, appeared to-require tint they should come to the aid of their suffering fellow-citizens Fiat justitia, mat caelum.
The people of the United States, assembled in Foederal convention, have decreed that no state Legislature should exercise the right of thus stepping in. between the parties to a contract, and the judges are bound by their oath of office to prevent the violation of the constitutional injunction.
It does not, however, necessarily follow that an act called for by other circumstances, than the apparent necessity of relieving debtors, one of the consequences of which is nevertheless to work some delay in the prosecution of suits, and consequently to retard the recovery and payment of debts, must always be declared unconstitutional
*543 In making a contract each party must know that his legal'remedy must depend on the laws of the country in which he may institute his suit. That the lex loci as to his remedy, even in the states that compose the Fcederal union, is susceptible of juridical improvement ; that the number of courts of original and appellate jurisdiction, the nature and extent of the respective jurisdiction of these, the number, time and duration of their sessions must from time to time, especially in new nud growing settlements, be regulated by the Legislature, according to the wants and exigencies of the country.
If, for example, the sessions of the District Courts, which in Louisiana are now held in each parish three times a year, were found too frequent* too-inconvenient to jurors, witnesses and suitors, and too expensive to the state, no one can say that the Legislature could not enact that the sessions of these tribunals should be semiannual only.
In most of the Parish Courts of this state, the trial by jury is not in use. Should the people of these parishes solicit the introduction of a jury in these courts, would the Constitution be violated by this improvement in our judicial system-? In Pennsylvania and Louisiana, courts of equity, as contradistinguished from courts of law, are unknown. Should the people. of these states, noticing the advantages resulting from the division *544 °f towand equity proceedings in the neighbouring states, s iw lit to try the experiment, is there aught in -.he Constitution of the United States that forbids their representatives in general assembly to accede to their wishes ? Yet semiannual sessions of our District Courts, the introduction of the trial by jury, and the institution of courts of equity must lengthen the period between the inception of many a suit and its final determination, and consequently delay some plaintiffs. But as the laws introducing such alterations in the juridical system would be productive of advantages in which both parties to the contract might occasionally participate, they would not, it is presumed be considered as impairing the obligations of contracts.
Again, in time of war, domestic commotion or epidemy, circumstances may imperiously demand, for a while, even a total suspension of judicial proceedings. A suspension which, in many cases, may be peculiarly beneficial to a plaintiff, who might be nonsuited, if the Court in which he may have instituted his suit were to proceed while his duty and that of his .agents and the interest of the state called them to a distant part of the country. It would be dangerous in such times, and often impossible, to insist on the regular attendance of i he officers of the Court, of jurors, witnesses and parties. No one would, in such cases, doubt the ability, nay, the obligation of the *545 Court to adjourn to the probable period of returning tranquillity. Can it be said that the interposition of the Legislature, if it happened to be in session, declaring the necessity of such an adjourn. ment, and with a view to that order and regularity, which uniformity produces, fixing a day on which juridical business will be resumed throughout the state, would be an act impairing the obligations of , contracts ?
Even if that day was fixed by half a dozen of weeks beyond that, on which any of the courts of the state might conceive they might safely re-enter on the execution of their duties, would not such a court recognise some advantage in, their forbearance from pressing business to the injury of such suitors, who entertaining a different opinion, and having no previous knowledge of the determination of the court, might stay aloof, in the fair persuasion that the happy period was not yet arrived?
I presume that in any time obnoxious to the due administration of justice, it is the duty, and within the power, of the Legislature, to pass laws to avert or diminish the consequences of the general calamity ; and a law called for by sucK circumstances, and fairly intended to meet the exigency of the day, could not be properly classed among those which impair the obligations of contracts, tho’ one of its consequences would be some delay in the recovery of debts. ,
*546 Testing, therefore, the section under consideration by the principles, which I have thus endeavoured to lay down, I find it stated in the preamble that “the present crisis will oblige a great number of citizens to take up arms in the defence of the state and compel them to leave their private affairs in a state of abandonment, which may expose them to great distress, if the Legislature should not, by measures adopted to the circumstances come to their relief.” The 3d section next provides that “no civil suit or action shall be commenced, or prosecuted before any court of record, or any tribunal of the state, till the first of May next.”
In fact, at the time the act was approved, the enemy was fast approaching, and five days after made his appearance within five miles of the city of New-Orleans. Shortly, after the whole militia of the state was called en masse into service, and they were not discharged till the middle of March. During the most of this period the fate of the contest was doubtful.
It was, therefore, advantageous to all parties that the administration of civil justice, should be confined to cautionary steps, which were not suspended. This was beneficial to all parties. Plaintiffs were relieved from attendance upon the courts, and the same indulgence was granted to defendants.
The ohject of this section of the act was, there*. *547 fore, to prevent the ill administration of justice which must have been the consequence of keeping the courts open, while the presence of the enemy disallowed any other attempt but that of expelling \ him. Another object was to facilitate to every member and officer of the court, and to every individual of the community, the means of rendering himself as useful as he could in repelling the invading foe. From the moment the danger subsided, I mean from the discharge of the militia then called out en masse, about six weeks will elapse, a time barely sufficient for the return home of our fellow-citizens who dwell at the greatest distance from the spot which has been the theatre of the war. Violent diseases of the political, as well as of the natural, body are followed by a convalescence, during which, even ordinary exertions may be hurtful. It does not appear to me that the suspension, was for a longer time than the courts themselves would have taken, if they had been left to the exercise of their own discretion, unaided by a legislative provision. , I am not, therefore, prepared to say _that the interference of the Legislature was any thing else than the exercise of legitimate authority. The suspension of civil proceedings, under some authority or other, for a short time, was a measure imperiously called for? it has been beneficial to. plaintiffs as well as to defendants in several cases, and although it may .create a little delay in the collection of debts, I d% *548 not find myself led by duty or inclination to consider the act as impairing the obligations of contracts, and I think it the duty of the Court to comply with the object, by enforcing the law.
Derbigny, J.
On the first question, that which. Concerns the effect which, the publication of the Martial Law has produced, with respect to the civil authorities, we might well have omitted giving a written opinion, now that the return of peace has re-established the empire of the laws ; but, having declared, on the day on which the discussion of this subject took place, that the powers vested in us by law could not be suspended by any but legislative authority, it is proper that we should give some explanation of the reasons on which that declaration was founded.
I will, therefore, examine how Martial Law ought to be understood among us, and how far it introduces an alteration in the ordinary course of goyernment.
To have a-correct idea of Martial Law in a free country, examples must not be sought in the arbitrary conduct of absolute governments. The monarch, who unites in his hands all the powers, may delegate to his generals an authority, unbounded as his own. But in a republic where the constitution has fixed the extent and limits of every branch of government in time of war, as *549 well as of peace, there can exist nothing vague, uncertain or arbitrary in the exercise of any authority.
The Constitution of the United States, in which every thing necessary to the general and individual security has been foreseen, does not provide, that in times of public danger, the executive power shall reign to the exclusion of all others. It does not trust into the hands of a dictator the reins of the government. The framers of that charter were too well aware of the hazards to which they would have exposed the fate of the republic by such a provision ; and had they done it, the states would have rejected a constitution stained with a clause so threatening to their liberties. In the mean time,' conscious of the necessity of removing all impediments to the exercise of the executive power, in cases of rebellion or invasion, they have permitted Congress to suspend the privilege of the writ of Habeas Corpus in those circumstances, if the public safety should require it. Thus far, and no farther, goes the Constitution. Congress, has not hitherto thought it necessary to authorize that suspension. Should the case ever happen, it is to be supposed that it would be accompanied with such restrictions, as would prevent any wanton abuse of power. “In England (says the author of a justly celebrated work on the Constitution of that county) at the time of the invasion of the, pretender, *550 assisted by the forces of hostile nations, the Habeas; Corpus act was indeed suspended ; but the executive power did not thds of itself stretch its own authority ; the precaution was deliberated upon, and taken by the representatives of the people; and the detaining of individuals in consequence of the suspension of the act was limited to a fixed time. Notwithstanding the just fears of internal and hidden enemies, Which the . circumstances of the times might raise, the deviation from the former course of the la w was carried no further than the single point we have mentioned. Persons detained by order of the government were to be dealt with in the same manner as those arrested at the suit of private individuals the proceedings against-them were to be carried on no otherwise than in a public place they were to be tried by their peers, and have all the usual legal means of defence allowed to them, such as calling of witnesses, peremptory challenge of jurors, ike.”- and can it be asserted, that while British subjects are thus secured against oppression in the worst of times, American citizens are left at the mercy of the will of an individual, who may, in certain cases, the necessity of which is to be judged of by himself assume a supreme, overbearing, unbounded power ! The idea is not only repugnant to the principles of any free government, but subversive of the very foundations of our own.
Under the constitution and laws of the United, *551 States, the President has a right to call, or cause to ' ° # be called into the service of the United States, even the whole militia of any part of the union, in case of invasion. This power, exercised here by his delegate, has placed all the citizens subject to militia duty under military authority and military law. That I conceive to be the extent of the Martial Law, beyond which, all is usurpation of power. In that state of things the course of judicial proceedings is certainly much shackled, but the judicial authority exists, and ought to be exercised whenever it is practicable. Even where circumstances have made it necessary to suspend the privilege of the writ of Habeas Corpus, and such suspension has been pronounced by the competent authority, there is no reason why the administration of justice generally should be stopped. For, because the citizens ate deprived temporarily of the protection of the tribunals as to the safety of their persons, it does by no means follow that they cannot have recourse to them in all other cases.
The proclamation of the Martial I jaw, therefore, cannot have had any other effect than that of placing under military authority all the citizens sub* ject to militia service. It is in that sense alone that the vague expression of Martial Law ought to be understood among us. To give it any larger extent would be trampling upon the constitution and laws of our country,
*552 But the counsel for the appellant, to support his assertion that in the circumstances then exist-jng, the Court could not administer justice, went further and said, tbit the city of New-Orleans had become a c,amp, since it had pleased the General of the seventh military district, to declare it so; and that within the precincts of a camp there can exist no other authority than that of the commanding officer. If the premises were true, the consequence would certainly follow. But the abuse of words cannot change the situation of things. A camp is a space of ground occupied by an army for their temporary habitation while, they keep the field. That space has limits : it does not extend beyond the ground actually occupied by the army. The camp of the American army during the invasion of our territory by the British, was placed at the distance of four miles below the city. During that time the city might be considered as a besieged place, having an entrenched camp in front. But the transformation of the city itself into a camp by the mere declaration of the General, is no more to be conceived, than would the transformation of a camp into a city by the same means.
It is therefore our opinion that the authority of courts of justice has not been suspended of right by the proclamation of the Martial Law, nor by the declaration of the general of the seventh military district that the city of New-Orleans was a camp f *553 ibid we qow repeat what we declared when the subject was discussed, “that the powers vested in us by law can be suspended by none but legislative authority.” - -
It now remains to examine whether we can proceed to hear the present rhotion on its merits, notwithstanding the act passed by the Legislature of this State on the 12th of December last, which provides among other-things, that all judicial proceedings in civil matters be suspended until the 1st of May next.
The appellees contend that this act is contrary to the Constitution of the United States, and to that of this state, inasmuch as it impairs the obligation of contracts, in opposition to positive prohibitions contained in both, against the enacting of such laws.
The right which courts of justice have to refuse their co-operation to the execution of unconstitutional laws, is no longer a Question. It results from the obligation contracted by the judges to support the constitution, the fundamental and supreme law of the state, which no authority can shake.' This court has already had occasion to express that opinion in the case of the syndics of Edward Brooks vs. William Weyman, ante 12; bút they have also there expressed their sense of the circumspection with, which such a right ought to be exercised. It is only in-cases where the incompatibility of *554 the law with the constitution is evident that courts will go the length of declaring null'ao act which emanates from legislative authority. Let us see if the law of the 18th of December last bear .that character.
Does á law, which retards the epoch at which the creditor may sue his debtor, impair the obligation of the contract ? Such is the present question.
“It is to be regretted,” says one of the Judges of the Supreme Court of the United States, “that words of less equivocal signification had not been adopted in that article of the constitution.” I am of the same sentiment : for what is the import of that expression, “ obligation of contracts ?” Must it be understood only of the nature of the obligation contracted, or does it extend to the effects of the obligation ? There are in a contract two sorts of obligations, one .moral, the other legal ; one by which the party binds himself in foro conscientiee ; the other by which he submits himself to be compelled in foro legis. Now this legal obligation, according to some opinions, is nothing else than the remedy which the law gives to one of the parties to compel the other to the performance of his obligation. Abstract subjects are liable to receive more than one interpretation. To me, the right, which the laws gives to one party to force-the other to comply with his obligation, is a thing totally different from the obligation itself. Pothier *555 calls that one of the effects of the obligation, which is evidently correct. After the party bound has refused, or neglected to comply, that effect of the obligation commences. Now, is that effect of the obligation comprehended within the article of the Federal Constitution alluded to ? If» it should be, then all the laws by which the least alteration is in* troduced in the manner of enforcing the execution of contracts are contrary to that principle. Thus a Legislature could not lengthen the time within which the judicial seizures and judicial sales shall be made, nor retard or accelerate the course of suits, without impairing the obligation of the ex. isting contracts. For where is the line of demarcation between the right of retarding one day, and that of retarding six months, the epoch when the creditor shall be paid ? To me, it is no satisfactory explanation to say that such changes are lawful under the Constitutional right which Legislatures have to alter and reform the judiciary system, for such alterations and reforms might be introduced with the necessary reservations not to affect existing contracts. It appears to me therefore indispensable, in order to avoid falling into inextricable difficulties and contradictions, that a line be drawn between the obligation and the remedy. The one emanates from the will of the parties ; the other is regulated by the law. The law owes to the citi-aens the aid of its power to, force,, to the performance Of his obligation, him who neglects or omits *556 ⅛ comply with it. A denial of'that aid, or (vyhat -would be as bad in its consequences) the withholding of that aid during an yun;easonable and un* necessary delay, would be contrary to the first principles of the social compact, according to which the government is bound to protect the citizens in the enjoyment of their property, and as such ought to be opposed by that department whose peculiar duty it is to maintain justice." But the manrter in which the authority of enforcing the execution of contracts shall be exercised, and the proper time for exercising it, must be at the discretion of the Legislature, to undergo modifications according to circumstances. In,the present occurrence, the Legislature of this state, seeing the very existence of the republic at stake,'the .enemy at our doors, and the whole population under arms, thought it necessary to suspend',during a reasonable time, the prdmary course of justice. That was doing no more than that would have resulted from the state of things. The administration of justice was already obstructed by the general call of the militia into service, which prevented almost all'the citizens front attending to their business, rendered the convocations of juries impossible, and retained in the, ranks of.the army even the officers of the courts. In such a situation, if the Legislature had not decreed the suspension of judicial proceedings, that suspension would nevertheless have taken place. *557 The courts themselves would have been under the necessity of adjourning their sessions to more happy times. That, which the empire of the circumstances rendered inevitable, the Legislature has done. I do not think that they have thereby overileapedi the constitutional boundaries of their power. Unexpected fortunate events have changed the face of things before the epoch assigned for resuming the usual course of judicial proceedings ; but if the delay fixed by the Legislature in their discretion was not unreasonable, they have done nothing more than they had a right to do, and the law must be obeyed.
The Court, therefore, direct that the motion of the appellees be overruled. See post 570.
The doctrine established, in the first part of the opinion of the Court, in the above case, is corroborated by the decision of the District Court of the United States for the Louisiana District, in the case of United States vs. Jackson, in which the defendant, having acted in oposition to it, was fined SI000. In Lamb's case,Judge Bay, ofSoutb-Carolina, recognised the definition of Martial Law, given by this Court, expressing himself thus : “If by Martial Law is to be understood that dreadful system, xhc law of arms, which in former times was exercised by the King of England and his' *558 Lieutenants when his word was the law, and his will the power, by which it was exercised, 1 have no hesitation in saying that such a monster could not exist in this land of liberty and freedom* The political atmosphere of America would destroy it in embryó. It was against such a tyrannical monster that we triumphed in our revolutionary conflict. Our fathers sealed the conquest by their blood, and their posterity will never permit it to tarnish our soil by its unhallowed feet, or harrow up the feelings of our gallant sons, by its ghastly appearance,. All our civil institutions forbid it : and the manly hearts of our countrymen are steeled against it. But, if by this military code are to be understood the rules and regulations for the government of our men in arms, when marshalled in defence of our country’s rights and honor, then lam bound to say, there is nothing unconstitutional in such a system.” Car. Law Rep. 330.
*** There was not any business done, during the month of April