The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 31, 2022

**No. A-1-CA-39557**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

      Petitioner-Appellee,

v.

**GENEVA C.,**

      Respondent-Appellant,

and

**THOMAS F.,**

      Respondent,

and

**JENNIFER C.,**

      Intervenor,

**IN THE MATTER OF ARTHUR F.**
**and ISRAEL F.,**

      Children.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**William E. Parnall, District Judge**

Children, Youth & Families Department
Mary McQueeney, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Law Firm of Alexander D. Crecca, P.C.
Sara Seymour Crecca
Albuquerque, NM

Guardian Ad Litem

**OPINION**

**YOHALEM, Judge.**

{1}     Geneva C. (Mother), a qualified individual with an intellectual disability as defined by the Americans with Disabilities Act (ADA), appeals the termination of her parental rights to her two children (Children). Mother's parental rights were terminated pursuant to NMSA 1978, Section 32A-4-28(B)(2) (2005, amended 2022), of the New Mexico Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2022). Mother raises three issues on appeal. She first contends that the Children, Youth and Families Department (CYFD) failed to satisfy the reasonable efforts requirement of Section 32A-4-28(B)(2) because CYFD's efforts failed to include reasonable accommodation for Mother's disability as required by the ADA. Mother next contends that CYFD failed to carry its burden to show by substantial, clear and convincing evidence that, with the assistance of reasonable efforts by CYFD, she was unlikely to be able to adequately parent Children in the foreseeable future. Third, Mother challenges the refusal of the district court to appoint a guardian ad litem (GAL) to assist her.

{2}     We agree with Mother that the state law requirement that CYFD make reasonable efforts to assist a parent incorporates the ADA requirement that the services provided by CYFD reasonably accommodate a parent's disability. We further hold that when the district court finds at the outset of an abuse and neglect

case that the parent is a qualified individual with a disability, as defined by the ADA, and orders that specific accommodations be made, as the court did in this case, CYFD must provide those accommodations. Because CYFD did not timely provide the accommodations ordered by the district court at the dispositional hearing, seek modification of the court's order, or advise the district court of these failures, the district court's finding that CYFD provided reasonable accommodations for Mother's intellectual disability in compliance with the ADA and with Section 32A-4-28(B)(2) was not fully informed. We therefore reverse the termination of Mother's parental rights on this basis and remand to the district court for reconsideration of its decision with full knowledge of the facts of this case.

{3}     Additionally, because the question will likely arise again on remand, we briefly address Mother's argument that the district court abused its discretion and denied Mother due process when it refused to appoint a GAL to assist her in understanding the legal proceedings, understanding and complying with her treatment plan, and making decisions in her own best interests. We hold that the district court properly relied on the evidence in the record concerning Mother's needs and abilities and that the court neither abused its discretion nor denied Mother due process when it found that appointment of a GAL was unnecessary and instead

required CYFD to provide Mother the assistance of a social worker[1] skilled in working with parents with disabilities.

**BACKGROUND**

{4}    Mother and Thomas F. (Father) have two children, Arthur and Israel. Arthur was three years old and Israel was one month old at the end of August 2018 when Children were taken into custody. Pointing to what CYFD claimed was Mother's need for constant reminders to attend to the needs of Children, CYFD alleged that Children were neglected due to Mother's intellectual disability. Father was diagnosed with schizophrenia, which led to violent outbursts that prevented him from adequately caring for Children, and CYFD alleged that Children were neglected due to Father's mental illness.[2] Following an adjudicatory hearing on October 9, 2018, continuing on January 7, 2019, and concluding on March 5, 2019, the district court entered an adjudication of neglect under Section 32A-4-2(G)(2), (4) based on Mother's intellectual disability, which the court found interfered with her ability to properly feed, clean, and care for Children.

---

[1]The district court referred sometimes to a "case worker" and more often to a "social worker." We use the term "social worker" throughout this opinion.

[2]Mother and Father were both respondents in the proceedings below and both were found to have neglected Children. Father refused throughout the proceedings to engage in services to address his diagnosis of schizophrenia or to participate in visits with Children. Father has not appealed. We therefore focus on facts relevant to Mother's appeal.

{5}      Mother's disability and the reasonable modifications to policies, practices, or procedures required to give Mother an equal opportunity to participate in her treatment plan, consistent with the ADA, were a focus of this case from the outset. At the custody hearing on September 4, 2018, the first hearing required by the New Mexico Abuse and Neglect Act, *see* § 32A-4-18(A) (requiring a custody hearing be held within ten days of taking a child into CYFD custody), Mother's counsel advised the district court that Mother had special needs arising from her disability and requested that Mother be provided necessary ADA accommodations. Counsel requested that Mother be appointed her own social worker to work closely with her and help her understand her treatment plan, transition to greater independence, and successfully reunite with Children. Counsel noted that she hoped they could "get a social worker on board quickly." At the conclusion of the hearing, the court approved the accommodations sought by Mother and allowed a relative to attend the upcoming adjudicatory hearing to assist Mother. The hearing ended with CYFD assuring the court that it was committed to providing Mother with a social worker.

{6}      At the outset of the adjudicatory hearing a month later, Mother's counsel again raised Mother's need for additional assistance due to her disability and asked the district court to appoint a GAL to assist Mother. Mother's counsel told the court that Mother "needs a lot of help and support and repetition" to make legal decisions. The court assured Mother and her counsel that if parents were adjudicated, they would

get their own social worker "to help them work their treatment plan [and] get them the services they need." The court described the appointment of a GAL as "superfluous" given that the court was requiring a social worker to work closely with parents and took the request for a GAL under advisement. A few days after this hearing, the district court entered an order requiring the appointment of a Family Support Services (FSS) social worker from a nonprofit agency that provides social workers skilled in working with individuals with developmental disabilities, noting that a social worker was "necessary due to Mother's cognitive difficulties."

{7}     At the continuation of the adjudication on January 7, 2019, counsel for Mother informed the district court that she had been unable to implement the district court's order because the FSS nonprofit is not a court program. Mother's counsel reported that she told the nonprofit agency that Mother "desperately needs your services" but was unable to get their agreement to provide services. Counsel reiterated that it was important for Mother to "have someone," noting that "this client really needs it." The district court responded, "I think they should be provided" and this "is something that can help someone with a disability." The district court at this point agreed to appoint a GAL for Mother.

{8}     On March 5, 2019, at the outset of the third and last day of the adjudicatory hearing, the district court rescinded its decision to appoint a GAL. Although the court announced that, on further consideration, it would not appoint a GAL, the court

decided during the dispositional hearing later that day to require CYFD to provide a social worker or to ensure one was provided by another agency. The court specifically stated that because the FSS services apparently were not available, it "want[ed] in the [dispositional] order" to be sure that if FSS workers were not provided, that Mother and Father "be given [a social worker] . . . to help them get where they needed to be."

{9}	During the discussion of the dispositional order and treatment plan, CYFD told the court that Mother's treatment plan was incomplete because CYFD was in the process of obtaining a supplementary evaluation of Mother. CYFD explained that it needed detailed recommendations on how to work effectively with Mother given her intellectual disability and that such recommendations had not been included in her initial neuropsychological evaluation. CYFD, therefore, was seeking to supplement Mother's evaluation. CYFD told the district court it was committed to submitting a modified treatment plan to the court when it received the supplemental evaluation.

{10}	At the conclusion of the hearing, the court noted it was adding to the dispositional order the two treatment plan provisions—that CYFD provide Mother with a social worker and that CYFD obtain a supplemental evaluation of Mother— discussed during the hearing. CYFD made no objection to these additions. The district court's written combined adjudicatory and dispositional order required

CYFD to comply with the ADA, which directs CYFD "to make reasonable modifications in policies, practices, or procedures," when the modifications are necessary to provide Mother an equal opportunity to participate in her treatment plan, "unless . . . [such] modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (2016). The order notes that the district court adopted the CYFD treatment plan "as clarified in open court," without specifically describing the content of the two clarifying orders issued from the bench.

{11}     In addition to the two modifications adopted in the court's dispositional order, Mother's treatment plan laid out the steps Mother was required to take in order to demonstrate appropriate parenting and a stable home life. Under the plan, Mother was required to (1) participate in individual therapy, (2) participate in Children's nonemergency medical and dental appointments, (3) submit to a random drug screen at CYFD's discretion, (4) participate in family time at least two hours per week, (5) obtain safe and stable housing, (6) remain free from intoxication, neglect, or abuse, and (7) participate in at least one reunification class offered by CYFD. Later in the case, when Father was not working his treatment plan, and Mother was warned both by CYFD and by the district court that she could not be reunited with Children if she remained with Father, separating from Father became an additional requirement of

her treatment plan. Drug addiction was found not to be a problem and, as a result, drug screening was removed from Mother's treatment plan.

{12} Mother initially struggled with the directives in her treatment plan. Mother was reported by CYFD staff to be uncooperative. She was unwilling to attend individual therapy, and she reacted negatively to criticism of her parenting by CYFD parenting coaches. Mother and Father were living with Mother's mother (Grandmother) in a shed outside the house in filthy conditions. Mother resisted CYFD's advice to move out of Grandmother's home and to leave Father, who was not working his treatment plan. Grandmother was described at the termination of parental rights hearing as actively interfering with Mother's ability to parent Children and preventing Mother from contacting her service providers. Grandmother frightened Mother with lies about supportive family living services being equivalent to jail in order to discourage Mother from taking CYFD's advice to move away. Grandmother was uncooperative and hostile with CYFD staff and service providers as well.

{13} Nevertheless, Grandmother remained Mother's primary liaison with CYFD, and the district court relied on Grandmother to assist Mother to understand the court proceedings and the requirements of her treatment plan. At the time CYFD filed the motion to terminate Mother's parental rights, no social worker had been provided to assist Mother with these tasks. Nor had CYFD completed the supplemental

evaluation the court had ordered it to complete. Annie King, a behavioral specialist working through the Medicaid program, told the court that she had not yet completed such an evaluation of Mother so she was unable to advise Mother's providers on how to work with her effectively. CYFD relied instead on the original, preadjudication neuropsychological evaluation, which CYFD had conceded lacked the detailed direction on how to work effectively with Mother that CYFD needed to reasonably accommodate Mother's disability.

{14} In February 2020, after filing a motion to terminate Mother's parental rights in December 2019, CYFD provided Mother the support of her own social worker. At that time, CYFD assigned Rosemary Villagomez, a CYFD permanency planning worker who was experienced in working with parents with intellectual disabilities, to work with Mother and provide the additional, individualized support the court had ordered. Villagomez was able to establish a relationship with Mother and to perform most, if not all, the functions the court intended a social worker would provide. Villagomez testified that she was able to meet with Mother frequently and to take time to talk with her. Mother gradually came to trust Villagomez's advice. Over the period of seven months between Villagomez's appointment and the termination of parental rights hearing, Mother began to engage in all of the treatment services offered to her, including psychological counseling and other services she had refused previously. Mother consistently attended psychotherapy every other week—

9

something that had been a problem before Mother began working with Villagomez. She agreed to attend hands-on parenting classes at Peanut Butter and Jelly, another difficult area for Mother. These classes were never provided, because of a long waiting list. With Villagomez's support, Mother separated from Father, and, in August 2020 moved out of Grandmother's house into a family supportive living home. Villagomez testified that Mother had improved more in the months she worked with her than Mother had since Children were taken into CYFD custody. The district court's findings noted this improvement.

{15} Because of the COVID-19 pandemic, CYFD had not visited Mother in her new home and was not able to report at the termination of parental rights hearing on Mother's progress performing tasks of daily living in that setting or on the feasibility of placing Children with Mother in her new home. There was testimony describing Mother's family supportive living home as a place where Children could possibly move in with Mother and where Mother could both care for them and continue to receive any necessary support. At the time of the termination of parental rights hearing, Mother was still struggling with parenting skills. Visits with Children, which Mother attended without fail, had moved online in February 2020. In June 2020 the in-person visits resumed. In addition to concern about Mother's level of parenting, CYFD also expressed concern about whether Mother would sustain her independence from Father and Grandmother in the long term. CYFD reported that it

would not consider Mother's new home stable until Mother had lived there successfully for at least six months. She had been there only two months at the time of the termination of parental rights hearing on October 16, 2020.

{16}     At the conclusion of the termination of parental rights hearing, the district court terminated Mother's parental rights to Children. The court found that (1) CYFD had made reasonable efforts to assist Mother in adjusting the conditions and causes that brought Children into custody, including providing reasonable accommodations for her disabilities; (2) Mother had not alleviated the conditions and causes of neglect; and (3) the conditions and causes of neglect were unlikely to change in the foreseeable future. The district court also found that Children needed permanency and that, therefore, termination of parental rights was in their best interests. This appeal followed.

**DISCUSSION**

**I.      CYFD Failed to Follow the Orders of the Court Directing CYFD to Reasonably Accommodate Mother's Disability**

{17}     Mother contends that the efforts made by CYFD did not reasonably accommodate her disability as required by the ADA and, therefore, were also not the reasonable efforts required by state law to assist her in remedying the causes and conditions that brought Children into custody. Mother focuses on CYFD's failure to provide the extra support and assistance of the social worker ordered by the court until February 2020—almost a year and a half into the case—and after a motion to

11

terminate her parental rights already had been filed. In addition, the evidence showed that the other accommodation ordered by the district court—a supplemental psychological evaluation, which was needed to provide direction to CYFD and other providers on how best to work with Mother—would be completed only after the termination of parental rights hearing.

**A.    The ADA**

{18}    We look first to the role of the ADA in the proceedings to terminate Mother's parental rights. The parties and the district court agreed at the outset of this case that Mother was a "qualified person with a disability" under the ADA, *see* 42 U.S.C. § 12131(2), and that CYFD's efforts would need to be modified to reasonably accommodate Mother's disability. *See State ex rel. Child., Youth & Fams. Dep't v. Johnny S., Sr.*, 2009-NMCA-032, ¶ 9, 145 N.M. 754, 204 P.3d 769 (providing that once the ADA is found to apply, the ADA requires that CYFD's efforts be modified to reasonably accommodate the parent's disability).

{19}    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The federal regulations implementing the ADA require that the services provided, both directly and through contract, be "as effective in affording equal opportunity to obtain the same result, to

gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii). Affording an equal opportunity to obtain the same result or the same level of achievement does not mean that an individual with a disability must be guaranteed the identical result, level of achievement, or outcome as a person without a disability; only that a person with a disability must be provided services that meet their special needs in a manner that gives them the same opportunity given others.[3] Meeting these requirements may require the state agency to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Reasonable modifications are required; the agency is not required, however, to fundamentally alter its services. *See id.* ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

{20}    The modifications required must be individually designed to meet the particular needs of the parent arising from their disability. *See PGA Tour, Inc. v.*

---

[3]*See* U.S. Department of Health & Human Services & U.S. Department of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Aug. 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html.

*Martin*, 532 U.S. 661, 688 (2001) (providing that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration"). In *Johnny S., Sr.*, this Court addressed the steps necessary to properly request reasonable accommodation under the ADA and to preserve any violation of the ADA for appeal. 2009-NMCA-032, ¶ 8. The Court held that "the parent bears the initial burden of asserting that the parent is a qualified individual with a disability under [the ADA]." *Id.* The parent is responsible as well for creating a factual and legal record to allow meaningful appellate review under the ADA. "At a minimum, . . . there must be a request for relief citing the ADA backed by facts developed in the record." *Id.*

**B.     Mother Properly Invoked the ADA and the District Court Ordered Reasonable Accommodations**

{21}     In this case, Mother's counsel took all of the steps required to timely raise the ADA issue for the district court's consideration. Mother asserted she was a qualified individual with a disability, created a record establishing the nature of her disability, established her ability to benefit from services designed to help her reunite with Children, and established the necessity of assistance to avoid discrimination based on disability. *See id.* The evidence showed that Mother's intellectual disability meant that Mother is slow to learn things and has a hard time with language, including expressing herself and understanding what others tell her. Mother's IQ was reported

14

to be in the borderline range, indicating mild brain dysfunction. Her executive functioning, which was reported by the neuropsychological evaluation to be intact, meant that she is able to make decisions, exercise judgment, and anticipate the consequences of her actions.

{22} CYFD did not dispute in the district court, and does not dispute on appeal, that Mother is a "qualified individual with a disability" under the ADA. The district court agreed and concluded that CYFD was required to modify its programs and services to give Mother an opportunity to remedy her neglect of Children and reunite with them.

{23} Mother also informed the district court and CYFD early in the case about the accommodations that were most important to enable her to make progress in her treatment plan. The ADA recognizes that the individual with a disability is often best able to define the necessary accommodations and, in some contexts, puts the burden on that individual to request a particular accommodation. *Cf. Trujillo v. N. Rio Arriba Elec. Coop, Inc.*, 2002-NMSC-004, ¶ 16, 131 N.M. 607, 41 P.3d 333 (holding that where an individual has a mental disability and "necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee, or his [or her] health-care provider" (internal quotation marks and citation omitted)). In the context of services from CYFD for a parent with a disability, this burden is shared. The determination of

15

"what accommodation may be reasonable . . . call[s] for a . . . collaborative effort between the parents, CYFD, and the district court." *Johnny S., Sr.*, 2009-NMCA-032, ¶ 9; *see also In re S.K.*, 2019 COA 36, ¶ 21 (providing that, in addition to a parent disclosing to the department his or her mental impairment or other disability, "the parent should also identify any modifications that he or she believes are necessary to accommodate the disability").

{24}     Mother's primary request, made at the very outset of the case, was for her own social worker to help her understand her treatment plan, engage effectively with the services offered, and communicate with CYFD and the district court. Mother and her counsel were aware that without assistance by someone with knowledge of how to work with an individual with an intellectual disability and the time to engage with Mother, Mother would be unable to understand the benefits being offered and unable to engage fully in services. Counsel repeatedly informed the district court of the necessity of this accommodation for Mother, beginning with the initial custody hearing and continuing through the three days of adjudicatory hearings. The district court agreed, acknowledging that this service was necessary and appropriate for Mother to accommodate her intellectual disability and ordered, on the first day of the adjudicatory hearing that a nonprofit agency, FSS, known by the court to work specifically with individuals with disabilities like Mother's, provide that service. When the district court was informed at the continuation of the adjudicatory hearing

16

in early January 2019 that the court's order was not enforceable, the court first announced it would appoint a GAL, but later withdrew that appointment. The court required CYFD to provide Mother her own social worker, either directly or through the private sector. The district court specifically requested that CYFD include this requirement in the dispositional order. CYFD made no objection to that order and, indeed, had earlier assured the court that it would provide such a service to Mother.

{25}     Mother also sought services that were individually tailored to her special needs. CYFD acknowledged to the court at the dispositional hearing that providing accommodations tailored to Mother's needs required professional advice about how best to work with Mother. CYFD represented that it was in the process of obtaining a supplemental evaluation of Mother in order to properly assess how to provide Mother with meaningful access to reunification services. This supplemental evaluation, followed by a revised treatment plan, was ordered by the court.

**C.     CYFD Failed to Follow the District Court's Orders for Reasonable Accommodation**

{26}     A review of the judicial review and permanency hearings shows no mention by CYFD (or by any party or the court) of the two orders for accommodation of Mother's disability announced by the district court at disposition. The dispositional order reflects the court's adoption of the case plan "as clarified in open court," but does not include their substance. There is no evidence in the record of judicial review and permanency hearings or in the termination of parental rights hearing that CYFD

17

brought these orders or any evidence of CYFD effort to comply with the orders to the court's attention. At the termination of parental rights hearing, King told the court that she had not yet completed a supplemental evaluation of Mother. As for the social worker, for reasons having nothing to do with the court's order,[4] Mother was provided an additional CYFD caseworker with experience working with parents with intellectual disabilities. Villagomez appears to have begun to provide the personalized assistance the court had in mind when it entered its dispositional order a year earlier. Given that Mother's disability slowed her learning, the supplemental evaluation had not been completed, and this service began only after the motion to terminate Mother's parental rights was filed, CYFD's efforts were not sufficient to reasonably accommodate Mother's disability or to comply with the district court order.

{27} Although the district court took judicial notice of adjudicatory and dispositional order in which the court had ordered ADA accommodations for Mother and adopted its two orders from the bench at the outset of the termination of parental rights hearing, CYFD did not bring these orders or its failure to comply with them to the court's attention, either at the judicial review or permanency hearings or at the termination of parental rights hearing. Moreover, CYFD does not claim on appeal to

---

[4] As CYFD's reason for assigning Mother an additional caseworker, the district court found that there was a disagreement between Mother's CYFD case worker and a Medicaid worker, which upset Mother.

have timely complied with these two orders or to have sought and obtained modification of the orders from the district court. CYFD instead asserts the adequacy of its initial preadjudication evaluation of Mother and claims that it provided the services required by that evaluation, again without mention of the two accommodations ordered by the court. CYFD also argues, in a single sentence, that it was not required to provide Mother the services of a social worker because such a requirement would amount to a wholesale change in its program, something not required by the ADA.[5]

{28}    New Mexico law is clear that CYFD must comply with the orders of the district court. The court is charged with making decisions about the provision of services and the progress of an abuse and neglect case, and CYFD is required to report to the court on both its own efforts to comply with the court's dispositional orders and court-ordered case plan, as well as reporting on the parent's progress. The Abuse and Neglect Act provides that "[i]f a child is found to be neglected or abused, in its dispositional judgment the court shall also order [CYFD] to implement and the child's parent, guardian or custodian to cooperate with any case plan approved by the court." Section 32A-4-22(C). Our Supreme Court has construed this statutory

_____

[5]Because this issue is addressed in a single sentence in CYFD's brief on appeal, without pointing us to any support in the record, we do not address this undeveloped argument.

19

provision to require CYFD to comply with the court-ordered case plan and with dispositional, permanency, and other orders entered by the district court. *See State ex rel. Child. Youth & Fams. Dep't v. Maurice H.*, 2014-NMSC-034, ¶ 18, 335 P.3d 746. CYFD is also charged by statute with reporting accurately to the district court on the status of the proceedings and on the facts affecting a parent's progress. *See id.*

{29}    In *Maurice H.*, a father learned his daughter was in CYFD custody three weeks before a scheduled termination of parental rights hearing and informed CYFD that he wanted to reunite with and care for his daughter. *Id.* ¶¶ 17-18. CYFD refused to evaluate the father or offer him any treatment services, despite an existing court order incorporating a treatment plan for him. *Id.* ¶ 18. Our Supreme Court firmly rejected CYFD's assertion that, despite a court order incorporating a family treatment plan for the father, which required an evaluation, "*it could have chosen* to evaluate [the f]ather" or, instead, to go ahead with the termination of parental rights hearing, in its discretion. *Id.* ¶ 18. Concluding that a court order directing treatment is binding on CYFD, the Court held that CYFD engaged in misconduct when it failed to tell the father that he had a court-ordered treatment plan and when CYFD failed to inform the district court, either prior to or at the termination of parental rights hearing, that there was a permanency order in place requiring the agency to implement the father's treatment plan. *Id.* ¶¶ 22, 30. "[CYFD] ignored its obligation,

and its arbitrary actions led the district court to doubt [the f]ather's presence and willingness to care for [the c]hild. The district court based its decision to terminate . . . on a lack of information and full disclosure of the actual facts." *Id.* ¶ 42.

**{30}** While we do not suggest CYFD engaged in the kind of intentional misconduct identified in *Maurice H.*, we conclude that a similar error occurred here. CYFD failed to incorporate into Mother's case plan the district court's orders concerning the accommodations it was required to implement and then failed as well to bring these orders, and its failure to comply with them, to the district court's attention. This Court has stated that a judgment terminating parental rights must be entered "only with the utmost circumspection and caution" due to the fundamental nature of those rights. *State ex rel. Child., Youth & Fams. Dep't v. Stella P.*, 1999-NMCA-100, ¶ 33, 127 N.M. 699, 986 P.2d 495. Because the district court was not presented with the facts concerning CYFD's lack of compliance with the reasonable accommodations ordered by the court, "we believe that the district court should be presented an opportunity to reconsider this case with full knowledge of the facts." *See Maurice H.*, 2014-NMSC-034, ¶ 30.

**{31}** We remand to the district court to reconsider its termination of Mother's parental rights. If the district court concludes that termination of Mother's parental rights is not warranted and that Mother is now stable in a family living situation where she is able to parent Children, then the court will need to make the difficult

21

decision whether circumstances nonetheless exist, making the return of Children to Mother's custody inconsistent with Children's interests. *See State ex rel. Child., Youth & Fams. Dep't v. Lance K.*, 2009-NMCA-054, ¶ 41, 146 N.M. 286, 209 P.3d 778 (finding that "the district court is in the best position to determine the present circumstances of the children and [the parent] and to balance the emotional interests of the children and [the parent's] rights").

## II. The District Court Did Not Deny Mother Due Process or Abuse Its Discretion in Refusing to Appoint a GAL

**{32}** Mother argues that the district court denied her due process and abused its discretion by refusing to appoint a GAL for her. Although we need not decide this issue, given we have reversed and remanded for further proceedings on other grounds, we address this issue because it is likely to arise again on remand. *See State v. Anderson*, 2016-NMCA-007, ¶ 20, 364 P.3d 306 (addressing additional issues likely to arise on remand, notwithstanding reversal on other grounds).

**{33}** Mother's counsel requested the appointment of a GAL to assist Mother in understanding the proceedings and to make decisions in Mother's best interests. Counsel also argued that a GAL would assist CYFD personnel and the district court in understanding the impact of Mother's cognitive disability on her progress in implementing her treatment plan. CYFD contends that the district court did not abuse its discretion or violate Mother's right to due process when it denied the request. The district court instead made a series of accommodations for hearings,

including allowing Grandmother and other family members to attend court with Mother and, at the termination of parental rights hearing, allowing a care provider to confer with Mother to clarify the proceedings. We agree with CYFD that the courtroom accommodations provided by the district court were appropriate, and that Mother's due process rights were not infringed by the court's refusal to appoint a GAL.

**{34}** Parents have a procedural due process right to participate meaningfully in a hearing that may result in the termination of parental rights. *State ex rel. Child., Youth & Fams. Dep't v. Maria C.*, 2004-NMCA-083, ¶ 17, 136 N.M. 53, 94 P.3d 796. This includes, at a minimum, "timely notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decision[]maker." *State ex rel. Child., Youth & Fams. Dep't v. Kathleen D.C.*, 2007-NMSC-018, ¶ 12, 141 N.M. 535, 157 P.3d 714 (internal quotation marks and citation omitted).

**{35}** In determining whether a parent's procedural due process rights were violated, our review is de novo. *State ex rel. Child., Youth & Fams. Dep't v. Jeremy N.*, 2008-

NMCA-145, ¶ 11, 145 N.M. 198, 195 P.3d 365. The question before us is whether the procedure followed increased the risk of an erroneous deprivation of Mother's interests and "whether an additional or substitute procedure would have eliminated or reduced that risk." *See id.* To succeed on a due process claim, "[p]arents need only demonstrate that there is a reasonable likelihood that the outcome might have been different." *State ex rel. Child., Youth & Fams. Dep't v. Pamela R.D.G.*, 2006-NMSC-019, ¶ 14, 139 N.M. 459, 134 P.3d 746 (internal quotation marks and citation omitted).

**{36}** Mother correctly notes that the failure to appoint a GAL to protect the interests of a respondent parent may constitute a denial of due process in some circumstances. *Cf. State ex rel. Child., Youth & Fams. Dep't v. Lilli L.*, 1996-NMCA-014, ¶ 14, 121 N.M. 376, 911 P.2d 884. Where, however, an adult parent is competent and represented by counsel, the decision to appoint a GAL is discretionary. *Cf. id.* ¶ 13 (providing that "while it is a general practice under [Rule 1-017 NMRA] for a guardian ad litem to be appointed to represent a minor who is a defendant in a civil case, it is clear the court is not required to appoint a guardian ad litem where the child is represented by counsel in such action"); Rule 1-017(D) ("The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make any other order as it deems proper for the protection of the infant or incompetent person.").

{37}    In this case, the district court acted within its discretion in refusing to appoint a GAL because Mother was both competent and capable of making decisions with the advice of counsel. The court reasoned that appointing a GAL would be "superfluous" because it is the role of Mother's attorney to provide legal advice to Mother and to argue on Mother's behalf to the court. Indeed, a lawyer is permitted to seek the appointment of a GAL only "[w]hen the lawyer reasonably believes that the client . . . cannot adequately act in the client's own interest." Rule 16-114(B) NMRA. Otherwise, a lawyer must endeavor to maintain as normal a client-lawyer relationship as possible. Rule 16-114(A) ("When a client's capacity to make adequately considered decisions . . . is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.").

{38}    Mother does not argue on appeal that a GAL was needed as a substitute decision maker, acknowledging that Mother is competent to make her own decisions. Instead, Mother claims that she needed someone "to assist her in navigating the abuse and neglect legal process, including access to resources to comply with the treatment plan." Mother does not explain, however, why a GAL, who is generally an attorney, would have provided specialized knowledge that her attorney did not have or why the role of accessing services was not more

25

appropriately played by a CYFD case worker or case manager, as the district court suggested.

{39} The district court accommodated Mother's impaired communication skills by ordering CYFD to provide a social worker to consult with and advise Mother, and by permitting service providers and family members to attend court hearings, and by taking multiple breaks to allow Mother to get assistance in understanding the proceedings from both these individuals and from her counsel. Putting aside CYFD's failure to timely follow the court's order to provide Mother her own social worker, there is no evidence in the record indicating that these accommodations would have been insufficient to provide the assistance Mother needed. The district court did not abuse its discretion in allowing Mother's family care provider to sit with her and communicate with her during the termination of parental rights hearing, rather than appointing a GAL.

{40} We therefore agree with CYFD that refusing to appoint a GAL did not deprive Mother of due process and that providing other accommodations in the courtroom for Mother's disability instead of a GAL was not an abuse of the court's discretion.

**CONCLUSION**

{41} For the reasons listed above, we reverse the termination of Mother's parental rights and remand to the district court for reconsideration of its decision with full

26

knowledge of the facts of this case and for any further proceedings consistent with this opinion.

{42}     **IT IS SO ORDERED.**

_____
**JANE B. YOHALEM, Judge**

**WE CONCUR:**

_____
**JENNIFER L. ATTREP, Judge**

_____
**SHAMMARA H. HENDERSON, Judge**